793 P.2d 1138

**The STATE of Arizona, Appellant,**

**v.**

**Rafael Vasquez MALDONADO, Appellee.**

**2 CA–CR 89–0609.**

Court of Appeals of Arizona, Division 2, Department B.

May 31, 1990.

Alan K. Polley, Cochise County Atty. by Thomas E. Collins, Bisbee, for appellant.

Robert Arentz, Cochise County Public Defender by Joseph P. DiRoberto, Bisbee, for appellee.

## OPINION

LIVERMORE, Presiding Judge.

The state appeals from the trial court's granting of appellee's motion to suppress 105 pounds of marijuana. For the reasons stated below, we affirm.

Appellee Rafael Vasquez Maldonado was charged by indictment with knowingly transporting marijuana having a weight of eight pounds or more, a class 2 felony. He moved to suppress the marijuana seized on the ground that the stopping of his vehicle was unlawful under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. The trial court granted the motion and, following dismissal of the charge, the state has appealed the suppression order.

The two border patrol agents who made the stop and the arrest on July 9, 1989, testified at the evidentiary hearing. According to agent James Splittstoesser, he and driver Barry Billeadeau were parked in a marked border patrol vehicle in the median of Interstate 10, 50 to 60 miles from the Mexican border, where they observed westbound traffic for approximately four hours. Splittstoesser noticed a 1977 Buick which he considered a "profile type of vehicle," often used to transport undocumented aliens, as it was an older model with wide passenger and trunk space. He further noted the vehicle was clean, also part of the profile, although he admitted that a dusty car can also fit the profile. He observed Maldonado and his passenger as they drove past, noting that they were of Hispanic descent and that Maldonado was wearing a hat and western-style clothing, "common dress for a lot of the aliens we apprehend...." Additionally, he observed that the driver and passenger did not appear to be talking to each other and that they avoided eye contact with the border patrolmen. He admitted that as the vehicle passed, he only had a few seconds to observe the individuals inside. Splittstoesser testified that, simultaneously, he and Billeadeau looked at one another after the Buick passed and "realized that this vehicle was a good prospect, a good bet."

The agents pulled their vehicle alongside Maldonado's, and, according to Splittstoesser, he "appeared to be holding the steering wheel very tightly looking straight down the road, just very tight, rigid. And they did not appear to be talking to each other." He stated that Maldonado's arm was stretched straight out and that he considered the position to be unnatural, although he admitted that could just be Maldonado's way of driving. He added that Maldonado was not exceeding and may even have been driving under the speed limit. Additionally, the car did not appear to be overloaded or riding low. The car had an Arizona license plate, but the patrolmen did not check the registration because their computers were down. Falling behind Maldonado's car, Billeadeau turned on the lights, pulling him over. The patrolmen had stopped three or four other cars that day from their position on I–10, claiming these vehicles also fit their profile of vehicles carrying illegal aliens, although the stops did not result in their finding any illegal aliens or contraband.

Agent Billeadeau corroborated Splittstoesser's testimony, emphasizing that an older model was important to him as part of the profile vehicle. He, too, stated that Maldonado and his passenger appeared

nervous, noting that they refused to make eye contact with the agents. He admitted that he did stop persons who made eye contact as well.

The trial court granted the motion to suppress, noting that the facts did not "rise to the level of articulable founded suspicion such that a stop in this case was warranted" and rejecting the state's argument that the agents had acted in "good faith" pursuant to A.R.S. § 13–3925, as they had not, in fact, made a mistake as to any of the facts. Thereafter, the state dismissed the charge without prejudice. On appeal, the state argues that the stop was lawful and that they had acted in good faith, believing that their conduct was proper, and that the evidence was seized as a result of a good faith mistake or technical violation under A.R.S. § 13–3925.

■ We will not disturb the trial court's ruling on a motion to suppress evidence absent clear and manifest error. *State v. Smith,* 136 Ariz. 273, 665 P.2d 995 (1983). In reviewing the trial court's decision, we view the facts and evidence presented at the evidentiary hearing in the light most favorable to sustaining the trial court. *State v. Warren,* 124 Ariz. 279, 603 P.2d 550 (App.1979).

■ First, we cannot say that the trial court's conclusion that the agents did not have reasonable, articulable suspicion was clear and manifest error. In *State v. Graciano,* 134 Ariz. 35, 37, 653 P.2d 683, 685 (1982), our supreme court held that while the facts sufficient to justify an investigatory stop will vary from case to case, the stop must be based upon "particularized" or "founded" suspicion by the officer, and that the officer must state an "articulable reason" for the stop. The court relied on the test set forth in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The first part of the test requires that all of the circumstances be taken into consideration, such as the officer's subjective observations which may be based upon his or her training and experience as well as objective factors such as certain operational patterns relating to the specific crime, suspicious conduct, and information from informers. "An assessment of all the circumstances, however, does not include a weighing of the officer's 'unparticularized suspicions' or hunches about a suspect or situation." *Graciano,* 134 Ariz. at 37, 653 P.2d at 685, *quoting Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883. As for the second part of the test, the Court required that "the above assessment raise a justifiable suspicion that the particular individual to be detained is involved in criminal activity." *Id.* See also *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

■ "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607, 618 (1975). A hunch is not enough. *United States v. Torres–Urena,* 513 F.2d 540 (9th Cir.1975). Indeed, a stop based on the officer's hunch and little more than the person's race or ethnic background is illegal and unconstitutional. *See Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The fact that the occupant of a vehicle never looked at the marked patrol car was not given any weight in *United States v. Escamilla,* 560 F.2d 1229 (5th Cir.1977). Additionally, in *Graciano,* our supreme court found that the fact that the driver of the vehicle was dark skinned and driving in the direction of the Mexico border in a vehicle desired by thieves with a license plate from a northern part of the state was not sufficient to raise a justifiable suspicion for the investigatory stop. And in *United States v. Mallides,* 473 F.2d 859 (9th Cir.1973), the Ninth Circuit held that where officers stopped a car based on the fact that six males appearing to be of Mexican descent were riding in a Chrysler Imperial at dusk, sitting erectly and not looking at the passing patrol car, the stop was unlawful. More recently, in *United States v. Hernandez–Alvarado,* 891 F.2d 1414 (9th Cir.1989), the same court found insuffi-

cient evidence to support a stop where 1) the car was an Oldsmobile with large trunk capacity, driven eight kilometers from the Mexican border in Nogales, 2) the driver, of Mexican descent, looked at the agent who pulled alongside him and quickly looked away, 3) all of the occupants of the vehicle were sitting rigidly with "tunnel vision" and did not appear to be speaking to one another, 4) the vehicle was purchased from Best Deal Auto, known for narcotics activity, 5) there was an antenna protruding from the trunk, and 6) the registered owner of the vehicle lived in an area of Nogales known for drug trafficking.

 The evidence presented at the suppression hearing reveals that the agents had little, if any, more than was presented in *Mallides* or *Graciano* and less than was presented in *Hernandez–Alvarado*. There was no particularized information about Maldonado or his passenger that warranted the stop. As in *Hernandez–Alvarado*, although the factors observed by the officers "may allow certain inferences to be drawn, they describe too many individuals to create a reasonable suspicion that this particular defendant is engaged in criminal activity" or was an illegal alien. 891 F.2d at 1418–19. We cannot say that the trial court's conclusion that the agents did not have sufficient grounds to justify the investigatory stop was clear error.

We also reject the state's argument that A.R.S. § 13–3925 requires reversal of the trial court's decision. The trial court found that the agents had stopped at least three or four other vehicles that day and, therefore, they were using the same, insufficient criteria, except that Maldonado appeared a little more rigid. The trial court concluded that the stops were made based upon hunches, "a good bet," which is not reasonable suspicion and does not rise to the level of good faith contemplated by § 13–3925(A). Under subparagraph B of the statute, good faith mistake may also mean "a reasonable judgmental error concerning the existence of facts which if true would be sufficient to constitute probable cause." A.R.S. § 13–3925(C)(1). The trial court concluded that the agents saw what

they saw and there were no factual mistakes which resulted in their erroneous though purportedly "good faith" judgment.

While the trial court reached the right result, it was for the wrong reason. We believe that A.R.S. § 13–3925 was intended to apply specifically to unlawful searches or seizures where the officers have acted in good faith. This issue is never reached in this case. Here, the inquiry ends with the resolution of the question whether the investigatory stop was lawful under *Terry v. Ohio, supra,* and its progeny. Having found that the trial court correctly concluded that it was not, we find that this provision is inapplicable.

Affirmed.

FERNANDEZ, C.J., and LACAGNINA, J., concur.