227 P.3d 868

**STATE of Arizona, Appellee,**

v.

**Alvin J. SWEENEY, Appellant.**

**No. 1 CA–CR 08–0775.**

Court of Appeals of Arizona,
Division 1, Department C.

March 30, 2010.

Terry Goddard, Attorney General By Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section, And Katia Mehu, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Law Offices of Lee Phillips PC By Lee B. Phillips, Flagstaff, Attorneys for Appellant.

## OPINION

SWANN, Judge.

¶1 Alvin J. Sweeney ("Appellant") was convicted of Transportation of Narcotic Drugs for Sale after the superior court denied a motion to suppress evidence seized from his car. We hold that after a lawful traffic stop has concluded, an officer must have reasonable cause to initiate a second detention of a suspect. In this case, we conclude that no such reasonable cause existed and the forcible detention of Appellant to facilitate a canine sniff constituted a violation of the Fourth Amendment. Accordingly, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY[1]

¶2 On the morning of January 8, 2008, Arizona Department of Safety Officer Mace Craft initiated a stop after he observed Appellant following another vehicle at what he believed to be an unsafe distance. Officer Craft, a member of the canine unit, was traveling with his drug interdiction dog. Officer Craft used a stopwatch to determine that the "gap" time between the vehicles was .88 seconds. Thereafter, Officer Craft activated his lights and initiated the stop.[2]

¶3 When Officer Craft approached Appellant's car from the passenger side, he noticed that Appellant's vehicle was a rental, and he smelled deodorizer emanating from the vehicle. Officer Craft also testified that when Appellant handed him his Canadian driver's license and the car rental agreement,[3] Appellant's hands were shaking and he was breathing heavily. Officer Craft asked Appellant to step back to his patrol vehicle, and, while filling out a warning citation, asked Appellant questions about his travels and the reason for his visit to Arizona.

¶4 During this exchange, Appellant told Officer Craft that he traveled from New York to Arizona in search of an old Chevrolet Camaro. Officer Craft found it unusual that someone would drive from New York to Arizona in search of a car and asked Appellant about the possibility of flying. Appellant responded that he enjoyed driving. When asked if he had found a Camaro online, Appellant responded that he had not. Officer Craft also asked Appellant where he stayed while in Arizona and Appellant responded, without elaboration, that he had stayed in a hotel.

¶5 After Officer Craft finished filling out the warning citation (a process that consumed eight minutes), he handed it to Appellant and wished him a safe trip. Appellant said "thank you very much," and Officer Craft responded "alright, be careful." When Appellant turned and began walking back to his vehicle, Officer Craft called out to Appellant and asked if he could speak with him again. In response, Appellant turned around and walked back to Officer Craft. Officer Craft asked Appellant whether he had anything illegal in his vehicle, and Appellant responded that he did not. Finally, Officer Craft asked for Appellant's consent to search the vehicle. Appellant replied, "No, you can't, cause I don't think it's in [the] law, is it?" Officer Craft responded, "No, it's not"

---

1. In our review of a denial of a motion to suppress "we view the facts in the light most favorable to upholding the trial court's ruling[s]." *State v. Box*, 205 Ariz. 492, 493, ¶2, 73 P.3d 623, 624 (App.2003) (citing *State v. Sheko*, 146 Ariz. 140, 704 P.2d 270 (App.1985)).

2. When Officer Craft activated his lights, a video system was activated and recorded the events of the encounter.

3. Appellant's vehicle was rented on January 1, 2008, in Syracuse, New York.

and requested Appellant's consent to a narcotics dog sniff of the car. Appellant again declined.[4]

¶ 6 After this exchange, Appellant again turned to walk toward his car when the officer grabbed Appellant by the arm, turned him around and told him he was being detained. After ordering Appellant to stand in front of the patrol car, Officer Craft called for another unit to stand by Appellant while he took his dog out of his car and walked her around Appellant's vehicle. The dog indicated the presence of drugs. When Officer Craft searched the car, he found a black bag in the trunk containing five kilograms of cocaine. Appellant was placed under arrest and indicted on two counts: (1) Transportation of Narcotic Drugs for Sale and (2) Possession of Narcotic Drugs for Sale.

¶ 7 Appellant moved to suppress the evidence seized from the car, arguing that (1) the detention was illegal; (2) the stop was illegal; and (3) the detention went beyond the scope of the traffic stop. The court held two evidentiary hearings, separately addressing the legality of the stop and the detention.

¶ 8 In a May 27, 2008 minute entry, the trial court found that there was reasonable suspicion to initiate a stop. The court gave little weight to Officer Craft's testimony that the "gap" time between Appellant's car and the vehicle it was following was .88 seconds. Instead, the court based its ruling on a number of factors, including the icy condition of the roadway and expert testimony concerning traffic speed and safe following distances.

¶ 9 In a June 20 minute entry, the court found that (1) the length of the detention was reasonable; (2) the encounter between Officer Craft and Appellant was consensual after the warning citation was given; and (3) there was reasonable suspicion for the continued detention. With respect to the continued detention, the court noted Officer Craft's testimony that his suspicions were aroused by the following factors:

(1) Appellant stated that the purpose of his trip was to buy a vintage Camaro in the Phoenix area. The officer concluded that it was not plausible for a person to drive over 4,000 miles round-trip to buy a car sight unseen.

(2) Appellant displayed an overly nervous demeanor, even after the officer told him that he was to receive a warning and not a citation. Appellant's demeanor included a shaking hand, heavy breathing and twitching cheeks.

(3) Appellant gave vague answers to questions regarding his travel, and attempted to deflect the officer's questioning by trying to discuss the weather. One answer in particular was suspicious to the officer. In response to a question about where he had looked in Phoenix to buy the car, Appellant had replied with a general statement about "car lots and stuff" rather than a specific location.

(4) A strong smell of deodorant emanated from the passenger side of the front compartment when the officer first made contact with Appellant. The officer testified that many times deodorants are used to mask the odor of drugs.

(5) Appellant had started the trip that day from Phoenix. The car was clean inside and out. It had snowed in Flagstaff the night prior to the stop.

(6) There was an atlas on the passenger seat of the car.

(7) The car was a rental car with Massachusetts license plates. Appellant rented it in Syracuse, New York, for a round-trip.

(8) Appellant is a Canadian citizen.

(9) When the officer was driving near Appellant's car prior to the stop, Appellant appeared to the officer to be avoiding his sight by sitting far back in his seat.

---

**4.** The request for consent was unnecessary, because "canine sniffs *during* lawful traffic detentions are not unconstitutional searches or seizures." *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 649 (8th Cir.1999) (emphasis in original). The fact that a sniff can occur without consent during a lawful traffic stop does not imply that a sniff is without Fourth Amendment implications when it is facilitated by an unlawful detention.

The court gave little weight to factors 2, 5, and 6; some weight to factors 7, 8, and 9; and great weight to factors 1, 3, and 4.

¶ 10 After a three-day trial, a jury found Appellant guilty of Transportation of Narcotic Drugs for Sale, and found that Appellant possessed an amount of cocaine in excess of nine grams.[5]

¶ 11 Appellant timely appeals. We have jurisdiction under Article 6, Section 9 of the Arizona Constitution and pursuant to A.R.S. §§ 12–120.21(A)(1) (2003), 13–4031 (2001), and 13–4033(A)(1) (Supp.2009).

## DISCUSSION

¶ 12 We generally review the denial of a motion to suppress with deference to the trial court's factual determinations, including its evaluation of the credibility of witness testimony. *State v. Box*, 205 Ariz. 492, 495, ¶ 7, 73 P.3d 623, 626 (App.2003). But we review de novo mixed questions of fact and law, including whether the totality of the circumstances gave rise to reasonable suspicion to support an investigative detention and whether the duration of that detention was reasonable. *See State v. Teagle*, 217 Ariz. 17, 22, ¶ 19, 170 P.3d 266, 271 (App.2007). In this case, the trial court also admitted into evidence an audio/video recording of the entire encounter between Appellant and Officer Craft, and that recording is part of the record on appeal. Because the trial court is in no better position to evaluate the video than the appellate court, we have conducted an independent review of the video evidence. *Cf. Danielson v. Evans*, 201 Ariz. 401, 406, ¶ 13, 36 P.3d 749, 754 (App.2001); *State v. McCoy*, 692 N.W.2d 6, 29 (Iowa 2005).

### A. The Detention of Appellant After the Termination of the Initial Stop Was Not De Minimis.

¶ 13 As a preliminary matter, we address the trial court's legal finding that any additional period of detention after the issuance of the warning and termination of the traffic stop was de minimis. Citing *$404,905.00* and *Box*, the court based its finding on the fact that there was reasonable suspicion for the continued detention, "especially given the strong governmental interest in preventing the transportation of illegal drugs on our roadways."[6]

¶ 14 In *$404,905.00*, the Eighth Circuit held that the Fourth Amendment was not violated when an officer conducted a dog sniff of the defendant's vehicle after the traffic stop was completed but before the defendant's license had been returned to him. 182 F.3d at 648–49. There, the driver did not object to a sniff of his car's exterior. The court reasoned that a two-minute delay to complete a dog sniff was a de minimis intrusion on the defendant's liberty. *Id.* at 649. In *Box*, this court held that a brief post-traffic-stop detention to accommodate a dog sniff was de minimis. 205 Ariz. at 499, ¶ 24, 73 P.3d at 630.

¶ 15 We cannot conclude that the post-traffic-stop detention in this case was de minimis. Unlike in *$404,905.00* and *Box*, Officer Craft waited until the arrival of a second officer (whose presence he had not requested until after Appellant declined to consent to a search) before conducting the sniff. Moreover, Officer Craft used physical force to detain Appellant when he grabbed his arm and ordered him to stand in front of the patrol car. And unlike *$404,905.00* and *Box*, there was nothing consensual about the encounter at the time it occurred. Because we conclude that the intrusion was not de minimis, we turn our examination to whether the duration of the detention was reasonable.

### B. The Duration of the First Detention Was Reasonable.

¶ 16 Traffic stops are seizures within the meaning of the Fourth Amendment, but because they are less intrusive than ar-

---

5. On the third day of trial, the court granted Appellant's Motion to Dismiss Count 2 (Possession of Narcotic Drugs for Sale) with prejudice.

6. While we agree that the State has a strong interest in preventing drug traffic, the strength of that interest has no bearing on the reasonableness of an officer's suspicion of any particular individual. Were we to accept the trial court's logic on this point, the rights of all people from unwarranted intrusion by the government would be diminished.

rests, an officer needs only reasonable suspicion that a traffic violation has occurred to initiate a stop. *Arizona v. Johnson,* —— U.S. ——, ——, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009) (permitting a traffic stop "when the police officer reasonably suspects" a traffic violation). If an officer has "an articulable, reasonable suspicion, based on the totality of the circumstances," that a traffic violation has occurred, he or she may conduct a limited investigatory stop. *Teagle,* 217 Ariz. at 22–23, ¶ 20, 170 P.3d at 271–72 (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

¶ 17 "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "[W]here there is less than probable cause to justify a stop, duration is an essential element in determining whether the initially lawful intrusion takes on the characteristics of an unlawful detention." *United States v. Huberts,* 637 F.2d 630, 636 (9th Cir.1980). After an officer has effectuated the purpose of the stop, he must allow a driver to continue on his way unless (1) the encounter between the driver and the officer becomes consensual, or (2) during the encounter, the officer develops a reasonable and articulable suspicion that criminal activity is afoot. *Teagle,* 217 Ariz. at 23, ¶ 22, 170 P.3d at 272.

¶ 18 Appellant argues that the duration of the first detention was not reasonable. There is no bright-line rule distinguishing an investigative stop from a de facto arrest. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). To determine the reasonableness of the length of a detention, we must consider the degree of intrusion on an individual's privacy and weigh that against the purpose of the stop and the diligence with which the officer pursued that purpose. *Id.* at 685–86, 105 S.Ct. 1568.

¶ 19 We do not find that the detention was illegally extended when Officer Craft inquired about Appellant's travels and his reasons for coming to Arizona. "An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the duration of the stop." *Johnson,* —— U.S. at ——, 129 S.Ct. at 788 (citing *Muehler v. Mena,* 544 U.S. 93, 100–101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)). Here, Officer Craft merely asked Appellant about his travels and the reasons for his visit while he was completing the paperwork to issue the warning, a process that consumed only eight minutes.

¶ 20 However, after the stop had been completed and Appellant refused to allow Officer Craft to conduct a search of his car, Officer Craft grabbed Appellant's arm, told him he was "being detained" and ordered him to stand in front of the patrol car. Accordingly, the continued detention of Appellant after he declined to allow the search was an additional seizure under the Fourth Amendment. We therefore turn our examination to whether Officer Craft had reasonable suspicion after completion of the stop to continue to detain Appellant to conduct a search of his vehicle.

### C. The Totality of the Circumstances Did Not Give Rise to Reasonable Suspicion for the Continued Detention.

¶ 21 Reasonable suspicion is something short of probable cause, but it must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). The Fourth Amendment requires that an officer have some minimal, *objective* justification for the detention. *Teagle,* 217 Ariz. at 23, ¶ 25, 170 P.3d at 272.

¶ 22 To determine whether circumstances give rise to reasonable suspicion, we view the totality of the circumstances, considering such objective factors as the defendant's appearance and conduct and the officer's relevant knowledge, experience, and training. *State v. Fornof,* 218 Ariz. 74, 76, ¶ 6, 179 P.3d 954, 956 (App.2008). We must not, however, "parse out each individual fac-

tor, categorize it as potentially innocent, and reject it. Instead, [we] must look at all of the factors, (all of which would have a potentially innocent explanation, or else there would be probable cause), and examine them collectively." *State v. O'Meara*, 198 Ariz. 294, 296, ¶ 10, 9 P.3d 325, 327 (2000). But circumstances or factors that do not reliably distinguish between suspect and innocent behaviors are insufficient to establish reasonable suspicion because they may cast too wide a net and subject all travelers to "virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curium). Instead, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Teagle*, 217 Ariz. at 24, ¶ 25, 170 P.3d at 273 (alteration in original) (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir.2004)).

■ ¶ 23 Here, Officer Craft testified that the following factors indicated to him that Appellant may have been transporting illegal drugs: (1) it was implausible that Appellant would travel 4,000 miles round-trip to buy a Camaro without first determining that one was available for purchase; (2) Appellant was overly nervous and his nervousness did not subside during the entirety of the detention;[7] (3) Appellant's answers to the officer's questions were vague, and he discussed the weather; (4) a strong smell of deodorizer emanated from Appellant's car; (5) Appellant's car was clean and devoid of personal effects; (6) there was an atlas on the passenger seat of the car;[8] (7) the car was rented in New York and had a Massachusetts license plate; (8) Appellant was a Canadian citizen; and (9) Appellant was driving while

sitting far back in his seat, in a rigid upright position.[9]

¶ 24 Considered in the aggregate, these factors did not give rise to objective reasonable suspicion of anything. At most, they gave rise to the "inchoate and unparticularized suspicion or hunch" that the Supreme Court rejected as grounds for detention in *Sokolow* and *Terry*. A reasonably prudent person's suspicions would not be raised after observing a foreign national driving a clean, deodorized rental car with an atlas on the passenger seat, who upon being stopped and questioned outside in the three-degree weather by the police, failed to articulate with specificity the places he had visited while staying in an unfamiliar city. A holding to the contrary would subject nearly everyone to a continued, intrusive detention following a routine traffic stop. Our review of the recording of the encounter reveals that Appellant was calm, friendly and cooperative during the entire stop. Whatever Officer Craft's subjective beliefs, we cannot agree that the totality of the circumstances gives rise to any objective suspicions that would not be raised regarding the most innocent travelers.

¶ 25 We note that the factors upon which Officer Craft and the superior court relied resemble those employed in drug courier profiles, which are now inadmissible at trial as evidence of guilt. *State v. Lee*, 191 Ariz. 542, 546, ¶ 18, 959 P.2d 799, 803 (1998). Of course, such evidence is not inadmissible on a motion to suppress, and may indeed be highly relevant to the evaluation of reasonable suspicion. *Beijer v. Adams*, 196 Ariz. 79, 82, ¶ 18, 993 P.2d 1043, 1046 (App.1999). Yet the plasticity of the factors employed in such

7. Despite Officer Craft's testimony on direct examination that Appellant's nervousness did not abate when informed that he was receiving only a warning, on cross-examination the officer testified that neither the shaking hand nor the heavy breathing was depicted on the video. With this we must agree—Appellant did not appear at all nervous on the video.

8. Officer Craft offered no explanation why it was suspicious that a Canadian citizen traveling cross-country would have a road map in his car.

9. In *State v. Maldonado*, we held that an automobile stop conducted by Border Patrol agents vio-

lated the Fourth Amendment because it was "based on nothing more than the year, type, and cleanliness of the vehicle, the apparent nationality of the driver and passenger, the style of their clothing, the apparent lack of conversation between driver and passenger, and the driver's manner of holding the steering wheel with an outstretched arm when the patrol car approached." *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 120–21, 927 P.2d 776, 780–81 (1996) (citing *Maldonado*, 164 Ariz. 471, 472, 793 P.2d 1138, 1139 (App.1990)).

analyses merits vigilance in the evaluation of objective reasonable suspicion.

¶ 26 In his dissent in *United States v. Hooper*, 935 F.2d 484, 499–500 (2d Cir.1991), Judge Pratt compiled a partial list of the conflicting attributes that had been held by courts to fit such a profile. Factors evidencing drug courier behavior included observations that the defendant: arrived late at night or arrived early in the morning; was one of the first to deplane, one of the last to deplane, or deplaned in the middle; used a one-way ticket or used a round-trip ticket; carried brand-new luggage or carried a small gym bag; traveled alone or traveled with a companion; acted too nervous or acted too calm; wore expensive clothing and gold jewelry; dressed in black corduroys, white pullover shirt, loafers without socks; dressed in dark slacks, work shirt, and hat; dressed in brown leather aviator jacket, gold chain, hair down to shoulders; dressed in loose-fitting sweatshirt and denim jacket; walked rapidly through airport or walked aimlessly through airport; flew in to Washington National Airport on the LaGuardia Shuttle; had a white handkerchief in his hand. *Id.* (internal citations omitted).

¶ 27 In this case, Officer Craft testified that the absence of luggage in the passenger compartment of Appellant's car caused suspicion, but that the *presence* of luggage also would have caused suspicion. These examples underscore the wisdom of our supreme court's wholesale rejection of profile evidence at trial in *Lee*, and illustrate the danger to nearly every innocent person of unchecked deference to law enforcement's objectively unsupported expressions of suspicion in support of warrantless searches.

¶ 28 We might overlook the objective circumstances revealed by the recording and instead marvel at the acuity of Officer Craft's instincts in identifying Appellant as a likely drug courier on such innocuous facts. But were we to engage in such tautological reasoning, we would render the Fourth Amendment a nullity—the objective (not instinctive) reasonable suspicion must exist *before* the detention, and the ultimate discovery of contraband cannot retroactively justify an otherwise unwarranted detention. We might also wonder after reviewing the recording whether the officer possessed other information that prompted his suspicions, but he testified to none.

¶ 29 Our reasoning is underscored by Officer Craft's own response to these factors during the initial seizure. Although he learned of these "suspicious" circumstances while conducting the initial traffic stop, he issued a traffic warning without conducting further investigation and announced the termination of the stop by releasing Appellant back to his car-despite the fact that he had in his car a drug interdiction dog who could have confirmed any suspicions in a matter of seconds before the stop ended.[10]

¶ 30 The parties agree that the traffic stop ended when the officer returned Appellant's paperwork and wished him a safe trip. When Officer Craft called out to Appellant to ask him to answer additional questions, Appellant's consent to such an encounter was established by the fact that he walked back to the officer and willingly answered the additional questions. Until this point in the second encounter, there was no intimidation or show of force and therefore no seizure under the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Teagle*, 217 Ariz. at 23, ¶ 23, 170 P.3d at 272.

¶ 31 In *United States v. Esquivel*, the court noted that "the Trooper's announcement that the traffic stop was over and [the defendant] was free to leave was also an intervening circumstance between the ... detention and the consent." 507 F.3d 1154, 1160 (8th Cir.2007). Here, Officer Craft announced that the traffic stop had ended before asking for consent to search. That announcement constituted an intervening event,

---

10. No suspicion at all would have been necessary to conduct the canine sniff while Appellant was lawfully detained as part of the traffic stop. *See $404,905.00*, 182 F.3d at 647. And if objectively reasonable suspicion had actually developed during the traffic stop, the officer could have detained Appellant for a reasonable period to conduct the sniff before terminating the stop even if a dog had not been present at the scene.

and nothing happened between that event and the detention of Appellant apart from his polite refusal of the officer's request for consent to search. Though the record shows that Officer Craft was trained to employ this "catch and release" tactic during traffic stops, that training does not trump the Fourth Amendment. Because Appellant did not consent to further detention, the further detention was unlawful absent reasonable suspicion.

¶ 32 Our review of the recording confirms that it was indeed Appellant's refusal to consent that triggered the sudden change in tone and tactics. But the invocation of one's constitutional rights cannot constitute a circumstance that gives rise to reasonable suspicion. If the mere refusal of consent itself constituted reasonable suspicion, nothing would prevent warrantless searches of random individuals, because either the grant or refusal of consent would eventually justify the searches. We conclude that the Fourth Amendment would be rendered largely meaningless by placing every person in such a Catch–22. *See State v. Palenkas,* 188 Ariz. 201, 212, 933 P.2d 1269, 1280 (App.1996) ("[W]e believe that a defendant's invocation of constitutional rights is *probative of no thing* except the defendant's awareness of his or her constitutional rights.").

## CONCLUSION

¶ 33 Because the circumstances here did not form a particularized and objective basis for the second seizure, the absence of consent rendered that seizure and subsequent search unlawful. We therefore reverse the trial court's denial of Appellant's motion to suppress.[11]

CONCURRING: LAWRENCE F. WINTHROP, Judge.

BROWN, Judge, specially concurring.

¶ 34 I agree that the trial court should have granted Appellant's motion to suppress. But I write separately because even if the events of the initial traffic stop support reasonable suspicion of criminal activity, that

information, without more, cannot be retroactively asserted as a basis for a second investigatory detention unrelated to the traffic stop. Accordingly, the second detention of Appellant was impermissible under the Fourth Amendment.

¶ 35 In considering the issues presented, it is helpful to consider the events sequentially. The overall encounter between Officer Craft and Appellant consisted of three distinct phases: (1) the traffic stop (the first investigatory detention), from the time Appellant was pulled over to the time Officer Craft returned his documents and told him to "have a nice day"; (2) the consensual encounter, from the time Officer Craft called Appellant back to ask him additional questions to the time Appellant refused to consent to a search of his vehicle and turned to leave; and (3) the second investigatory detention, from the time Officer Craft grabbed Appellant's arm through the remainder of the interchange.

### A. Initial Traffic Stop

¶ 36 Appellant contests the validity of the traffic stop, asserting that A.R.S. § 28–730 (2008) requires only that a "driver of a motor vehicle ... not follow another vehicle more closely than is reasonable and prudent and [with] due regard for the speed of the vehicles on, the traffic on and the condition of the highway." He contends there is no specific following distance or "gap time" required by the statute and argues he was not following the vehicle in front of him more closely than was reasonable or prudent under the circumstances at the time of the traffic stop. As such, he asserts the stop was invalid unless Officer Craft had probable cause.

¶ 37 A police officer may make an investigative traffic stop if the officer has a reasonable suspicion of a traffic violation. *State v. Starr,* 222 Ariz. 65, 68, ¶ 12, 213 P.3d 214, 217 (App.2009). Additionally, peace officers may "stop and detain a person as is reasonably necessary to investigate an actual or suspected violation ... and to serve a copy of the traffic complaint for an alleged civil or crimi-

11. Because we conclude that the trial court erred in ruling that there was reasonable suspicion to

support the second seizure, we need not address Appellant's other arguments.

nal violation of [that] title." A.R.S. § 28–1594 (2004).

¶ 38 Here, the record indicates that Officer Craft observed Appellant travelling .88 seconds behind the vehicle in front of him while driving at 70 miles per hour on an interstate highway shortly after a snowfall. Officer Craft determined this distance to be unsafe under the circumstances and therefore in violation of A.R.S. § 28–730. He testified that in his experience and training, two seconds between vehicles was the minimum safe distance required. Although there was conflicting testimony about whether Appellant's following distance was indeed reasonable under the circumstances, there was sufficient evidence to support Officer Craft's contention that he had a reasonable suspicion that Appellant had violated A.R.S. § 28–730, thus affording Officer Craft a valid reason for stopping Appellant. Because Officer Craft had a valid reason for stopping Appellant based on reasonable suspicion of a traffic violation, the traffic stop need not be evaluated under a probable cause standard.[12]

## B. Consensual Encounter

¶ 39 Once a police officer returns a driver's documents and hands him a written citation, the purpose of the traffic stop has concluded. *Teagle*, 217 Ariz. at 23, ¶ 23, 170 P.3d at 272. At that point, the officer conducting the stop must permit the driver to proceed on his way without any further delay or questions *unless* the encounter between the driver and the officer becomes consensual *or* the officer gains reasonable suspicion of illegal activity during the traffic stop, which permits an extension of that stop to investigate those suspicions. *See id.* at 23, ¶ 22, 170 P.3d at 272; *see also United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997) (citations omitted).

¶ 40 Whether a traffic stop has evolved into a consensual encounter or whether it has merely been extended based on reasonable suspicion is a critical question in evaluating whether subsequent police conduct is justified under the Fourth Amendment. A traffic stop evolves into a consensual encounter once the officer has returned the driver's license and registration and the driver reasonably believes he is free to leave. *Box,* 205 Ariz. at 498–99, 73 P.3d at 629–30 (citing *United States v. Hernandez,* 93 F.3d 1493, 1498 (10th Cir.1996) ("A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.")); *see also United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993). Only at that point may the officer ask the driver additional questions unrelated to the traffic stop. *Teagle,* 217 Ariz. at 23, ¶ 23, 170 P.3d at 272 (citations omitted). Such questions may include whether the driver is carrying anything illegal and if the police officer may search the driver's vehicle. *Id.* (citations omitted). As with any voluntary encounter, the driver is free to leave at any time and the officer may only subsequently detain the driver based upon reasonable suspicion of criminal activity. *Box,* 205 Ariz. at 497, ¶¶ 16, 21, 73 P.3d at 628.

¶ 41 An encounter that is not consensual, but merely constitutes an *extension* of the traffic stop, triggers a different analysis. A traffic stop may be extended if during the course of a valid stop a police officer determines that reasonable suspicion of criminal activity exists. In that circumstance, the officer may continue to detain the driver to investigate his suspicions provided that the detention is "temporary and lasts no longer than is necessary to effectuate the purpose of the stop [and] ... the investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Teagle,* 217 Ariz. at 23, ¶ 21, 170 P.3d at 272 (quoting *Royer,* 460 U.S. at 500, 103 S.Ct. 1319). Stated differently, the continued detention is permissible if the length of the detention is de minimis and the scope of the

---

**12.** Appellant relies on *Whren v. United States* to argue that seizure of an individual based solely on observation of a specific violation of the law requires probable cause. 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). However, Appellant's reliance is misplaced. As stated in *Starr, Whren* holds only that probable cause is sufficient to support a traffic stop, not that it is necessary. 222 Ariz. at 68, ¶ 12, 213 P.3d at 217.

investigation reasonably relates to matters affecting the officer's suspicion.

¶ 42 In this case, the parties agree that the traffic stop ended when Officer Craft returned Appellant's driver's license and rental documents to him, and then wished him a good day. At that point Appellant was free to leave unless Officer Craft had reasonable suspicion of criminal activity, in which case Officer Craft could properly extend the traffic stop to investigate those suspicions. *Teagle*, 217 Ariz. at 23, ¶ 22, 170 P.3d at 272.

¶ 43 The parties disagree, however, as to whether the subsequent questioning by Officer Craft was a consensual encounter. Appellant contends that the subsequent questioning by Officer Craft constituted an impermissible extension of the initial traffic stop. The State counters that Appellant was free to decline the officer's request that he answer additional questions or otherwise terminate the encounter. The evidence in the record supports the State on this point. After receiving the warning, Appellant turned and walked towards the driver's side of his car. At Officer Craft's request, he turned around and walked back to engage in further conversation. Additionally, after Appellant refused to give his consent to a search of his car, he again turned around and began walking toward his car until he was restrained by Officer Craft. Thus, the record clearly supports the conclusion that Appellant reasonably believed he was free to leave following the conclusion of the initial stop.[13]

¶ 44 The consensual interchange ended, however, as soon as Officer Craft grabbed Appellant's arm and informed him that he was detaining him. From that point forward, Appellant's detention constituted an additional seizure within the meaning of the Fourth Amendment. *Teagle*, 217 Ariz. at 23, ¶ 25, 170 P.3d at 272.

## C. Second Detention

¶ 45 Determination of whether an investigative detention meets constitutional require-

ments turns first on (1) whether the police officer's action was justified at its inception and then (2) whether the action was reasonably related in scope to the circumstances for the stop in the first place. *Id.* at 24, ¶ 27, 170 P.3d at 273 (citing *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868).

¶ 46 The second detention started when Officer Craft grabbed Appellant's arm and informed him he was being detained. *Mendenhall*, 446 U.S. at 553, 100 S.Ct. 1870 (A person is "seized" within the meaning of the Fourth Amendment only when by means of physical force or show of authority his freedom of movement is restrained.). Because Officer Craft and Appellant were engaged in a consensual encounter immediately prior to this point, Appellant was not seized and the Fourth Amendment was not implicated. *United States v. Munoz*, 590 F.3d 916, 920 (8th Cir.2010) (recognizing that once a completed traffic stop evolves into a consensual encounter, there is no seizure and the Fourth Amendment is not implicated); *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir.2007) (same). As such, the initial stop was not extended and this second detention, unrelated to the traffic stop, could only be justified if reasonable suspicion of criminal activity was aroused during the consensual encounter. *See id.; see also In re Ilono H.*, 210 Ariz. 473, 477, ¶ 12, 113 P.3d 696, 700 (App.2005) (citing *United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000) (finding that once an interchange evolves into a consensual police-citizen encounter, an officer cannot conduct the exchange as an investigatory stop absent reasonable suspicion that criminal activity is underway)).

¶ 47 A similar situation was examined in *State v. Ballard*, 617 N.W.2d 837 (S.D.2000). Ballard was stopped for a traffic violation; during the stop the officer noticed that Ballard was fidgety, her hands were shaking, and she looked "wired." *Id.* at 839, ¶¶ 2–4. After issuing a warning citation, the officer

---

13. If the evidence did not support a finding that the encounter was consensual, then I would address this case as an extension of the traffic stop. Under that scenario, assuming reasonable suspicion had been aroused during the stop, I would find that the length of the continued detention was de minimis. *See Teagle*, 217 Ariz. at 26, ¶¶ 33–34, 170 P.3d at 275; *Box*, 205 Ariz. at 498–99, ¶¶ 21–23, 73 P.3d at 629–30.

told Ballard she was "free to leave." *Id.* at 839, ¶ 4. He then told her he was suspicious of drugs in her car and asked for her consent to search it; Ballard refused. *Id.* Nonetheless, the officer detained her and requested a drug interdiction dog be brought to the scene to sniff the vehicle. *Id.* at ¶ 5. Approximately five minutes later the dog arrived, sniffed the vehicle, and alerted. *Id.* at ¶ 6. The vehicle was then searched, drugs were found, and Ballard was arrested. *Id.* The South Dakota Supreme Court concluded that detaining Ballard after informing her she was free to go was impermissible under the Fourth Amendment. *Id.* at 841, ¶ 15. As relevant here, the court reasoned that "[a]ll the observations [ ] made about [Ballard] occurred before [the officer] told her she was free to go and no new suspicious information arose before he decided to detain her further." *Id.* The court further noted that after a police officer signals to a traffic violator that he or she is free to go, "the Fourth Amendment intercedes to limit a further detention or search." *Id.* at 842, ¶ 17 (citing *$404,905.00 in U.S. Currency*, 182 F.3d at 648). The court acknowledged that the case was a "close call" on when detention becomes unreasonable, but held that "[a] refusal to give consent to search after the motorist is free to leave cannot give rise, of itself, to further suspicion and justification for a search; otherwise, the exercise of a Fourth Amendment right would be meaningless." *Id.* at 842, ¶ 17.

¶ 48 The 10th Circuit examined a similar situation in *United States v. Williams*, in which it arrived at a different conclusion. 271 F.3d 1262 (10th Cir.2001). There, Williams was stopped for a traffic violation. *Id.* at 1264. During the stop, the officer became suspicious that Williams was involved in criminal activity based on a number of observable indicators. *Id.* at 1265. Nonetheless, after clearing Williams' driver's license and registration, he returned the documents to Williams and indicated he was free to go. *Id.* The officer then asked if he could ask additional questions, to which Williams agreed. *Id.* Among the questions the officer asked were whether Williams was carrying any contraband or large amounts of cash and if Williams would agree to a search of his

car. *Id.* After Williams denied having any contraband or cash and refused a search of the vehicle, the officer informed him that he was being detained for a canine sniff of the vehicle. *Id.* When the dog arrived, it alerted to the trunk of the car where several large bales of marijuana were found. *Id.* Williams was then arrested. *Id.* Williams argued, *inter alia*, that the officer lacked reasonable suspicion to detain him in order to conduct a dog sniff. *Id.* at 1266. The court examined whether there was sufficient evidence of reasonable suspicion aroused during the traffic stop to warrant *extending the stop* to permit the dog sniff. *Id.* at 1268–69. Williams did not argue, and the court did not analyze, whether the return of Williams' documents at the completion of the traffic stop evolved the stop into a consensual encounter or whether the detention for the dog sniff was a second, independent stop which required newly aroused reasonable suspicion. *Id.* at 1266, 1268–71. Because those two matters are of central importance in this case and were not considered in *Williams*, it is not persuasive authority here.

¶ 49 On the other hand, I find *Arizona v. Johnson* instructive on this issue. —— U.S. ——, 129 S.Ct. 781. In that case, the passenger of a car that had been validly stopped for a traffic violation agreed to answer questions about an unrelated matter while the driver's documents were being cleared. *Id.* 129 S.Ct. at 784–85. Prior to beginning the questioning, the passenger was subjected to an involuntary pat-down; a gun was found, and the passenger was arrested as a prohibited possessor. *Id.* at 785. Upon review, the United States Supreme Court held that the pat-down was not a violation of the passenger's Fourth Amendment rights because it was conducted during a valid stop that had not yet evolved into a consensual encounter; a distinction the Court found to be noteworthy. *Id.* at 787–88.

¶ 50 In this matter, the State inexplicably contends that despite releasing Appellant at the conclusion of the initial stop, instead of merely extending the initial stop, Officer Craft initiated a second detention for the singular purpose of conducting a dog sniff based solely on information he gleaned dur-

ing the just-concluded traffic stop. The State provides no explanation, however, as to why Officer Craft did not act or could not have acted on his apparent suspicion when it allegedly first arose. Further, the State cites no authority, nor has my research revealed any, that supports such wholesale retroactive reliance on reasonable suspicion as a basis for a subsequent, unrelated detention.

¶ 51 If Officer Craft had developed reasonable suspicion that Appellant was engaged in criminal activity during the initial traffic stop, he would have acted permissibly in detaining Appellant beyond the scope of the initial stop in order to investigate those suspicions. *See supra,* ¶ 41. Likewise, initiating a second detention following the consensual encounter would have been proper had reasonable suspicion been aroused during the voluntary exchange. *See supra,* ¶¶ 39–40. Neither situation occurred here. Instead, all of the facts upon which the State relies to support reasonable suspicion occurred during the initial traffic stop. Yet, Officer Craft did not act on those suspicions at that time; he permitted Appellant to go on his way. He then engaged Appellant in voluntary questioning—a consensual encounter. The only significant event that occurred during that exchange, lasting forty-one seconds,[14] was Appellant's refusal to consent to the requested search and sniff.[15] That refusal obviously cannot provide the basis for supporting reasonable suspicion. *See also Wood,* 106 F.3d at 946; *Palenkas,* 188 Ariz. at 212, 933 P.2d at 1280; *Ballard,* 617 N.W.2d at 842, ¶ 17.

¶ 52 If Officer Craft did not have reasonable suspicion sufficient to detain Appellant at the conclusion of the traffic stop, he certainly did not gain any additional insights to arrive at such a conclusion during this extremely brief consensual encounter. If he did have reasonable suspicion, then he was obligated to act on it before telling Appellant he could leave. *Johnson,* —— U.S. at ——, 129 S.Ct. at 786 (stating that once reasonable suspicion is aroused, police officers must be positioned to act instantly on that suspicion); *see also Terry,* 392 U.S. at 20, 88 S.Ct. 1868 (recognizing the need for police officers to take swift action based upon on-the-spot observations that lead to reasonable suspicion). He failed to do so and assumed the risk that Appellant would not consent to a search of the vehicle. In sum, the second detention of Appellant was impermissible because it was initiated from a consensual encounter in which no event occurred that by itself, or in combination with information obtained during the initial traffic stop, would have caused the arousal of reasonable suspicion justifying a second, independent detention.

¶ 53 Officer Craft testified that he was trained to follow a procedure similar to that in *Ballard;* specifically, he was trained to issue a warning, release the motorist from the traffic-stop detention, call him back to initiate a consensual encounter, seek consent to sniff or search, and then detain for a sniff and search if consent is declined. This tactic apparently is implemented in an attempt to obtain consent to search the motorist's vehicle without having to rely on reasonable suspicion or probable cause as a basis for the search. While I question the wisdom of such a practice, *see Ballard,*[16] I am unaware of any current legal impediment to its use. Police officers may engage in certain interrogation practices, including the technique described by Officer Craft. In doing so, however, they run the risk that the individual being investigated will exercise his constitutional right to refuse a search of his vehicle. The officer must then be prepared to justify

14. The videotape of the encounter shows the initial traffic stop concluding at 9:03:33 and the second detention being initiated at 9:04:14.

15. The State does not argue that anything occurred during the consensual encounter which would have aroused further suspicion. At the suppression hearing, Officer Craft testified that Appellant had a "little smirk on his face." Appellant's alleged reaction, however, occurred after he was grabbed by Officer Craft and ordered to stand in front of the police car.

16. The *Ballard* court expressed concern "with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles." 617 N.W.2d at 842, ¶ 17.

a second detention based on additional factors not originally discovered during the initial traffic stop.

¶ 54 For the reasons explained in this concurrence, I agree with the majority's conclusion that the evidence seized from Appellant's vehicle must be suppressed.