NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA,
*Appellant,*

v.

MCKAYLAN TIERRA MARIE MUDD,
*Appellee.*

No. 1 CA-CR 20-0215
FILED 5-18-2021

---

Appeal from the Superior Court in Coconino County
No. S0300CR201900153
The Honorable Ted Stuart Reed, Judge

**AFFIRMED**

---

COUNSEL

Coconino County Attorney's Office, Flagstaff
By Daniel Noble
*Counsel for Appellee*

Antol & Sherman, PC, Flagstaff
By Bryan A. Antol
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Samuel A. Thumma delivered the decision of the Court, in which Judge D. Steven Williams and Judge David D. Weinzweig joined.

---

**T H U M M A**, Judge:

¶1   The State of Arizona appeals the superior court's order granting defendant McKaylan Mudd's motion to suppress. Because the State has shown no error, the order is affirmed.

### FACTS AND PROCEDURAL HISTORY

¶2   Viewing the evidence at the suppression hearing in a light most favorable to sustaining the order, *State v. Butler*, 232 Ariz. 84, 87 ¶ 8 (2013), one morning in February 2019, an Arizona Department of Public Safety Trooper saw a gray sedan going eight miles over the speed limit on Interstate 40. The Trooper activated his lights and safely stopped the car two miles later. It was 8:13 a.m.

¶3   The Trooper got out of his patrol car and approached the car on the passenger side. Mudd was in the driver's seat and a male was in the front passenger seat. The Trooper saw no signs of contraband or illegal activity in the car or impairment by the occupants. After introducing himself, the Trooper explained he "would be issuing a warning for the speeding violation," not a ticket.

¶4   The Trooper asked Mudd for her driver's license and the car's registration. Mudd gave the Trooper her license, stating it was a rental car. She also provided the Trooper the rental agreement, showing she rented the car at the Nashville International Airport three days earlier and the car should have been returned the day before. At that point, the superior court later found, the Trooper had all the information he needed to write the warning, other than inspecting and recording the Vehicle Identification Number (VIN) located on the car's door or dashboard.

¶5   The Trooper then directed Mudd to "just come on back" and sit with him in his patrol car as he processed her warning on his dashboard computer. The Trooper later testified that this was an order and Mudd "needed to come back to my vehicle." The Trooper routinely asks "violator[s] to come back to my vehicle," adding "that's typically how I

conduct 99 percent of my traffic stops." When asked why he instructs almost every motorist to join him in his patrol car, the Trooper said it improves safety by separating him from passing traffic and separating drivers from concealed weapons, adding that he can smell their breath for alcohol.

¶6　　　　Mudd went with the Trooper and sat in the front passenger seat of the patrol car; the passenger remained in the rental car. The Trooper ran Mudd's "driver's license information through dispatch, verified the necessary information from the rental agreement, and typed the driver and vehicle information into the simple half-page warning document." While doing so, the Trooper asked Mudd about 20 questions unrelated to speeding, including questions "about her trip, her family, and her employment." Mudd said she and the passenger (her brother) were returning to Tennessee after visiting their hospitalized uncle in "Los Angeles, I mean, Huntington Park," adding "our uncle had surgery" and "it's not looking good." Mudd could not remember the hospital's name, and the Trooper described her as fidgety and anxious. Mudd also volunteered that her brother was blind, and they received a speeding ticket "on the way over here."

¶7　　　　After questioning Mudd for "approximately 11–12 minutes," the Trooper left Mudd in the patrol car and went back to the rental car to confirm the VIN. The Trooper had not yet returned Mudd's license and admitted he "did not yet believe he had the necessary reasonable suspicion to detain [Mudd] beyond the issuance of the warning."

¶8　　　　When confirming the VIN, the Trooper asked the passenger various questions unrelated to the speeding issue for about two minutes. When asked "what brings you guys out west," the passenger said he and Mudd had been in San Diego visiting their mother for about a "week-and-a-half." He denied there was a family emergency or that they visited other family members. The Trooper testified that he "noted many of the passenger's answers were inconsistent with" Mudd's.

¶9　　　　The Trooper then returned to his patrol car. Rather than give Mudd the warning, the Trooper then asked her another 15 questions for another five minutes or so. The Trooper confronted Mudd with her passenger's inconsistent answers, which she could not explain. The Trooper eventually asked Mudd if there were drugs in the car; she said no. The Trooper then took Mudd's pulse. The Trooper later testified her pulse was "130 beats per minute, which the Trooper interpreted as reflecting her

'extreme anxiety.'" Mudd denied consent for the Trooper to search the rental car. She also denied consent to have a K-9 sniff the car's exterior.

¶10  The Trooper had not, by that point, given the warning for speeding to Mudd or returned her documents. The Trooper radioed for a K-9 unit, which arrived at 8:48 a.m., 35 minutes after the traffic stop began. A drug-detection dog alerted to the rental car. The Trooper then searched the car and discovered nine pounds of methamphetamine, marijuana and drug paraphernalia. Mudd and her passenger were arrested at 8:53 a.m. No warning was issued that day. In fact, Mudd did not receive the warning until months later.

¶11  The State charged Mudd with transportation of dangerous drugs for sale, a Class 2 felony; possession of narcotic drugs, a Class 4 felony; possession of marijuana, a Class 6 felony; and possession of drug paraphernalia, a Class 6 felony. Mudd filed a pretrial motion to suppress the evidence found inside the rental car, arguing the Trooper improperly extended the traffic stop to investigate unrelated crimes without reasonable suspicion. At an evidentiary hearing, where the Trooper testified, the court also received an audio/video recording, showing forward from the patrol car and the patrol car passenger compartment, lasting nearly 19 minutes and capturing some of the sights and sounds of the interaction. After weighing and assessing the evidence, including credibility, and hearing argument of counsel, the court granted Mudd's motion to suppress.

¶12  In a detailed 10-page minute entry, the superior court found the Trooper had reasonable suspicion of speeding to justify the initial traffic stop but impermissibly extended the stop:

> In this case, once [Mudd] provided the trooper her driver's license and the rental agreement, the trooper needed only to (1) visually inspect and write down the VIN on the vehicle, (2) check [Mudd's] driver's license and determine whether there were any outstanding warrants, and (3) type up and deliver the simple warning document to [Mudd]. The trooper did not need [Mudd] to join him in his patrol car to conduct these traffic-based inquiries expeditiously. The trooper did not have safety concerns justifying his requirement that [Mudd] join him in his patrol car. The trooper did not need to interview [Mudd] about her trip, her family, her

4

employment, etc., to complete the mission of the stop: issuing a warning for excessive speed. [Mudd's] presence in the trooper's patrol car was not a consensual encounter. The trooper had not yet developed independent reasonable suspicion to justify seizure of [Mudd] for inquiries unrelated to the warning. As the Supreme Court enunciated in *Rodriguez* [*v. United States*, 575 U.S. 348 (2015)], the critical question is not whether the "unrelated inquiries" occurred before or after the officer issued a ticket or warning, but whether the "unrelated inquiries" prolonged — i.e., added time to — the stop. *Id.* By requiring [Mudd] to join him in his patrol car when he required no further information from her and immediately questioning her on topics unrelated to the warning, the trooper detoured and prolonged the traffic stop beyond the scope authorized by his reasonable suspicion that [Mudd] had committed a traffic offense. This action violated [Mudd's] Fourth and Fourteenth Amendment right against unreasonable seizures.

The court found that "[b]ecause the evidence discovered in [Mudd's] vehicle was obtained as a result of an unconstitutional warrantless seizure, [Mudd's] motion to suppress said evidence is granted." The State unsuccessfully moved for reconsideration. This court has jurisdiction over the State's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) §§ 12-120.21(A)(1), 13-4031 and 13-4033(A) (2021).[1]

**DISCUSSION**

**I.      Applicable Fourth Amendment Standards.**

¶13      The State argues the superior court erred in granting Mudd's motion to suppress based on two primary assertions: (1) the Trooper could ask Mudd to come to his patrol car; and (2) the Trooper could ask Mudd questions while he filled out the warning. But the dispositive issue is

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

different: whether the Trooper's actions measurably extend the traffic stop beyond the time needed to reasonably complete its mission. *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *Illinois v. Caballes*, 543 U.S. 405, 408 (2005); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (noting law enforcement questions unrelated to the traffic stop are permissible "so long as the inquiries do not measurably extend the stop's duration").

¶14 The "central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1969). Making that determination under the facts provided in any particular case requires the court to balance "the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citing cases).

¶15 A traffic stop must "last no longer than necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). That includes "checking the driver's license, determining whether there are outstanding warrants against the driver, . . . inspecting the automobile's registration and proof of insurance" and the time required for officers "to attend to related safety concerns." *Rodriguez*, 575 U.S. at 354, 355. Among other things, (1) the "scope" of an investigatory "detention must be carefully tailored to its underlying justification," and (2) the "investigative methods employed [by an officer] should be the least intrusive means reasonably available." *Royer*, 460 U.S. at 500 (citation omitted).

¶16 The State has the burden to prove a seizure "justif[ied] on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* The Fourth Amendment requires probable cause when "a police confinement" extends "beyond the limited restraint of a *Terry* investigatory stop." *Id.* at 496.

¶17 When conducting a traffic stop, a police officer may also require "certain negligibly burdensome precautions in order to complete his mission safely," *Rodriguez*, 575 U.S. at 356, including the "mere inconvenience" of ordering motorists to exit their vehicles, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Police officers cannot, however, wield pretextual "safety precautions" designed to "facilitate" investigation of other crimes, at least until gaining reasonable suspicion of the other crimes. *Rodriguez*, 575 U.S. at 356.

## II.    The Superior Court Did Not Abuse Its Discretion.

**¶18**    "In reviewing an order involving a motion to suppress, we review the facts in the light most favorable to sustaining the order, and will not disturb the trial court's ruling absent 'clear and manifest error.'" *State v. Dean*, 206 Ariz. 158, 161 ¶ 9 (2003) (quoting *State v. Hyde*, 186 Ariz. 252, 265 (1996)). This court reviews a ruling on a motion to suppress for an abuse of discretion, deferring to the "court's factual findings if reasonably supported by the evidence," but reviewing the court's "ultimate legal determination de novo." *State v. Adair*, 241 Ariz. 58, 60 ¶ 9 (App. 2016). This court will not "reweigh the evidence or reassess credibility issues on appeal." *Williams v. King*, 248 Ariz. 311, 317 ¶ 26 (App. 2020) (citation omitted).

**¶19**    The superior court found the Trooper required Mudd to come to the patrol car "when he required no further information from her" and "question[ed] her on topics unrelated to the warning" for more than 15 minutes. By taking these actions, the court found the Trooper "detoured and prolonged the traffic stop beyond the scope authorized by his reasonable suspicion that" Mudd was speeding. Based on these facts, the court found the Trooper's actions violated Mudd's Fourth and Fourteenth Amendment right against unreasonable seizures.

**¶20**    On this record, the State has not shown the superior court abused its discretion. That court received and balanced the evidence by weighing the Trooper's stated reasons for ordering Mudd's presence in the patrol car against "the intrusion into [Mudd's] personal liberty occasioned" by his order. *See Mimms*, 434 U.S. at 109–11 ("[W]e look first to that side of the balance which bears the officer's interest in taking the action that he did," and then "weigh the intrusion into the driver's personal liberty occasioned . . . by the order to get out of the car."). The superior court's reasonableness determinations, turning as they did on an assessment of witness credibility and weighing evidence, are supported by the evidence presented at the evidentiary hearing.

**¶21**    Citing *United States v. Sharpe*, the State correctly asserts that "[t]here is no hard and fast limit for gauging the reasonableness of length of the detention." 470 U.S. 675, 686 (1985) (noting *United States v. Place*, 462 U.S. 696 (1983) "expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop"). Had the superior court applied such a per se rule here, it would have erred. *Cf. State v. Sweeney*, 224 Ariz. 107, 109 ¶ 5 (App. 2010) (noting preparing and completing warning ticket "consumed eight minutes"). The court, however, did not apply a per se,

hard-and-fast time limit for the stop. Instead, it considered the specific facts presented, found certain actions unrelated to speeding extended and prolonged the stop and, based on those factual findings, concluded the ensuing search and seizure of drugs and paraphernalia violated Mudd's constitutional rights.

¶22 The court found the Trooper required no more information from Mudd to process the warning after she provided her driver's license and the rental agreement. The Trooper did not notice any weapons or drugs in plain view. Nor did Mudd's traffic offense require her presence in the patrol car. Indeed, the Trooper offered no unique or specific reasons to order Mudd's presence in the patrol car. Although the Trooper testified his routine was for safety purposes, the superior court did not accept that justification as a factual matter. Moreover, the Trooper could have protected himself against passing traffic with less intrusive alternative methods, such as talking to Mudd through the passenger window on the passenger side as he did when first approaching Mudd's car. *Royer*, 460 U.S. at 504 ("We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases."); *see also Mimms*, 434 U.S. at 111 ("Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both."). The evidentiary record supports the court's factual findings. And the State has not shown that the legal conclusions based on those factual findings were wrong.

## CONCLUSION

¶23 The superior court's order granting Mudd's motion to suppress is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:     AA