NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

SUZANNE JEANNETTE MALLOY, *Appellant.*

No. 1 CA-CR 19-0295
FILED 6-1-2021

Appeal from the Superior Court in Yavapai County
No.  P1300CR201700264
The Honorable Tina R. Ainley, Judge

**REVERSED AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

The Zickerman Law Office, PLLC, Flagstaff
By Adam Zickerman
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Chief Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Michael J. Brown joined. Judge D. Steven Williams dissented.

_____

**S W A N N**, Chief Judge:

**¶1**  Suzanne Jeannette Malloy agreed during a traffic stop to allow law enforcement to conduct a dog sniff of the exterior of her vehicle. After the dog alerted, law enforcement searched the vehicle and discovered illegal drugs and drug paraphernalia. Malloy was charged with and convicted of multiple drug possession counts. She appeals, contending that the physical evidence was obtained via an illegal detention and consent extracted by duress. We reverse and remand because we conclude that the detention was unlawfully prolonged, which tainted her consent.

## FACTS AND PROCEDURAL HISTORY

**¶2**  On the evening of February 18, 2017, Trooper Aguilera of the Arizona Department of Public Safety stopped a vehicle for exceeding the speed limit on the I-17. Trooper Aguilera approached the stopped vehicle on the passenger side and made contact with the driver, Jeffrey Shaw, and the front-seat passenger, Malloy.

**¶3**  After informing Shaw that he had been speeding, Trooper Aguilera asked for Shaw's driver's license as well as the vehicle's registration and proof of insurance. Shaw provided his license, Malloy provided the registration (which was in her name), and Malloy informed Trooper Aguilera that she was looking for the insurance information on her cell phone. As Malloy manipulated her phone, Trooper Aguilera spoke to the pair. They told him that they were traveling to Phoenix from Arkansas, where they had gone to look at a 1938 coupe. Trooper Aguilera observed that Malloy's hand was shaking and thought that she appeared nervous; indeed, Shaw jokingly told Malloy to relax. After Malloy located the insurance information on her phone and showed the screen to Trooper Aguilera, the trooper asked Malloy for her identification. As Malloy located her driver's license, Shaw again told her to relax. Trooper Aguilera took their licenses and the registration back to his patrol vehicle.

¶4          In his patrol vehicle, Trooper Aguilera checked the stopped vehicle's information. He learned it had no lien and had been registered within the previous six months—which he viewed as significant because "[a] lot of times with criminal activity or potential drug trafficking, vehicles are fairly newly registered and they don't have liens." He also learned the vehicle had crossed over the Mexican border a few times, as recently as the month before. After concluding the checks, Trooper Aguilera prepared a traffic warning.

¶5          Trooper Aguilera returned to Shaw and Malloy, informed them that he was issuing a warning, and asked Shaw to step out of the vehicle to sign the warning—the only task left for its completion. As Shaw exited, Malloy asked Trooper Aguilera how old he was. Trooper Aguilera answered that question and then asked Malloy several questions about the pair's trip to Arkansas. In response, Malloy stated that she and Shaw had stayed "two or three days" in Arkansas and that the trip had taken "a while." She further stated that Shaw had gone to look at the 1938 coupe with his friend. In Trooper Aguilera's opinion, Malloy still appeared to be nervous.

¶6          Trooper Aguilera left Malloy and walked back to Shaw, who was waiting by the patrol vehicle along with one uniformed and two plain-clothes law enforcement officers. After removing his computer from the patrol vehicle, Trooper Aguilera spoke to Shaw, first telling him the basis for the traffic warning and next asking him several questions about the trip to Arkansas. In response, Shaw stated that they had traveled to see a 1932 coupe, that they had stayed in a hotel and he thought it was a Super 8 but was not sure, and that they had no friends or family in Arkansas.

¶7          Trooper Aguilera then handed Shaw the computer and directed him to sign the warning on the screen. After Shaw signed and returned the computer, Trooper Aguilera manipulated it while telling Shaw that he would print the warning. Trooper Aguilera then asked Shaw if there was anything illegal in the vehicle. Shaw said no. Trooper Aguilera asked Shaw for consent to search the vehicle, and Shaw responded the trooper would have to talk to Malloy. Shaw did, however, consent to a search of his own bags within the vehicle. At this point, approximately eleven minutes had elapsed since Trooper Aguilera initiated the roadside stop.

¶8          Trooper Aguilera left Shaw at the patrol vehicle and approached Malloy, who was still sitting in the stopped vehicle. He asked her if there was anything illegal in the vehicle, and she said no. He then

3

asked her for consent to search the vehicle, and she said no. He next asked if she would allow him to "just run a dog around it," and she agreed.

¶9        Trooper Aguilera returned to his vehicle and radioed for a canine officer. He then informed Shaw, who was still waiting by the patrol car, that Malloy had consented to a dog sniff and that he had a dog coming. Shaw asked if he could return to his vehicle, and Trooper Aguilera agreed but advised him, "Don't drive off or nothing, 'cause I still got your ID and all that." Trooper Aguilera then promptly collected the warning printout, the registration, and the driver's licenses, and returned them to Shaw and Malloy in their vehicle. As he did so, he advised Shaw and Malloy that he had a dog coming.

¶10        Approximately fifteen minutes later, a canine officer arrived. Less than two minutes later, the dog sniff began. The dog ultimately alerted to the presence of drugs. Law enforcement searched the vehicle and discovered that a purse in the front passenger seat held multiple syringes as well as substances consistent with illegal drugs.

¶11        Malloy moved to suppress the physical evidence on the ground that Trooper Aguilera's request that Shaw exit his vehicle unlawfully prolonged the traffic stop beyond the time reasonably required for its completion. The superior court denied the motion, concluding that Malloy freely and voluntarily consented to the dog sniff. In so concluding, the court found, contrary to the record, that Trooper Aguilera had "handed back the paperwork" before asking Shaw for consent.

## DISCUSSION

¶12        We review the denial of a motion to suppress with deference to the superior court's factual findings, including its findings on credibility, but we review de novo mixed questions of law and fact and the court's ultimate legal conclusion as to whether an investigative detention was warranted and of reasonable duration. *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007). We independently review the body-camera footage of the encounter that Malloy provided at the suppression hearing. *See State v. Sweeney*, 224 Ariz. 107, 111, ¶ 12 (App. 2010).

¶13        Law enforcement may detain a vehicle and its occupants pending inquiry into a traffic violation. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). As part of

the mission of the stop, an officer may perform such tasks as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. But the officer's authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. So though the officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," he or she "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. "The seizure remains lawful only 'so long as unrelated inquiries do not measurably extend the duration of the stop.'" *Id.* (quoting *Johnson*, 555 U.S. at 355). Once the mission of the traffic stop is or reasonably should be completed, the officer must allow the vehicle's occupants to continue on their way unless the encounter becomes consensual or the officer has developed a reasonable and articulable suspicion of criminal activity. *State v. Kjolsrud*, 239 Ariz. 319, 322–23 (App. 2016) (citing *Sweeney*, 224 Ariz. at 112, ¶ 17).

¶14        Here, Trooper Aguilera's observation that Shaw was speeding justified his detention of Shaw and Malloy and his requests for Shaw's driver's license, the vehicle's registration, and the vehicle's insurance information. His questions as he collected Shaw's driver's license and the vehicle information did not prolong the stop, and his request that Malloy provide her identification—a request with which she voluntarily complied—did not cause unreasonable delay. As Trooper Aguilera checked the vehicle's information, he learned that it had some characteristics consistent with drug trafficking: it had no liens; it was recently registered; and it had crossed the Mexican border several times, including the month before. He then prepared a traffic warning and asked Shaw to exit his vehicle to sign it.

¶15        Malloy contends that "[o]nce [Trooper Aguilera] ordered Mr. Shaw from the vehicle, it is clear that the Trooper was no longer attending to the original 'mission' of the traffic stop." On this record,[1] we must

---

1        We note the incompleteness of the body-camera footage provided at the suppression hearing—there is an unexplained absence of audio in the footage during the entirety of the approximately six-minute period during which Trooper Aguilera sat in his patrol car, accompanied by an off-duty detention officer, conducting the checks on the stopped vehicle and preparing the warning. In view of the incomplete audio, the footage gives an incomplete picture of the circumstances surrounding Trooper Aguilera's

disagree. Explaining the warning and obtaining Shaw's signature was essential to the purpose of the stop. And though nothing in the record suggests that Trooper Aguilera could not have accomplished those tasks while Shaw remained seated, we detect no illegality in his decision to request that Shaw exit the car. Trooper Aguilera testified that during most stops he will ask the driver to exit, because:

> [I]t gets them out so that I can have them sign my computer. It's a very expensive computer which I don't like handing into vehicles with a potential of somebody -- it getting dropped or somebody dragging off with it, and then it allows me to talk to the occupants a little bit more while we're back there.

Contrary to the state's contention, Trooper Aguilera's testimony does not support the conclusion that he asked Shaw to exit as a human safety measure as permitted under *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). But the testimony does establish other grounds for Trooper Aguilera's request, and we cannot say that those grounds were unreasonable. To be sure, we view Trooper Aguilera's stated concern about the computer being dropped with some skepticism—after all, the body-camera footage shows that he permitted Shaw to independently handle the computer over the roadside in light rain. And we are mindful that "removing the driver from the car to undertake further questioning falls into the category of a 'detour' from the mission of the underlying traffic stop." *Kjolsrud*, 239 Ariz. at 323, ¶ 14. But we must conclude that Trooper Aguilera's concern that the computer could be "dragg[ed] off" if handed into the stopped vehicle was not unreasonable.

¶16 As Shaw exited the vehicle, Malloy asked Trooper Aguilera his age. Malloy's spontaneous question invited any delay occasioned by Trooper Aguilera's answer. Trooper Aguilera, however, did not stop at answering Malloy's question—he continued to engage her in unrelated, albeit brief, conversation by asking her further questions about her trip. But even if Malloy's inquiry could be said to have opened the door to Trooper Aguilera's questions, we detect no justification for Trooper Aguilera's

---

request that Shaw exit the vehicle. Audio of the conversation—or the absence of conversation—between Trooper Aguilera and his companion would permit the court to more accurately evaluate the trooper's motivation in his subsequent interactions with Shaw and Malloy. But Malloy, who offered the footage at the suppression hearing, appears never to have challenged its incompleteness. We therefore evaluate this case based on the record before us.

subsequent questioning of Shaw—which, tellingly, he later admitted he had planned to engage in *before* she asked his age, "[j]ust to get a quick story of where they were coming from." *See Rodriguez*, 575 U.S. at 356 (recognizing that on-scene investigation into other crimes detours from the mission of the traffic stop).

¶17 Trooper Aguilera testified that by the time he exited his patrol vehicle: "The warning was completed. I just needed a signature at that point." Upon joining Shaw by the patrol vehicle, Trooper Aguilera removed his computer and told Shaw the basis for the warning. Explaining the warning was, of course, central to the mission of the stop. After Trooper Aguilera completed that explanation, however, the only stop-related tasks that remained were to obtain Shaw's signature and provide him with the warning and his documents. There existed no further justification to delay those easily accomplishable administrative tasks. But instead of immediately pursuing those tasks, Trooper Aguilera asked Shaw further questions about his trip. To be sure, those questions were brief and did not significantly extend the duration of what was, until that point, not an unreasonably long encounter. But the body-camera footage and the trooper's testimony establish that there was no reason the stop should not have been completed when Trooper Aguilera explained the warning. We hold that the questioning "measurably" and therefore unlawfully extended the stop. And the extension of the stop was no more consensual in this case than it was in *Rodriguez*. *See* 455 U.S. at 355; *see also Kjolsrud*, 239 Ariz. at 322–23, ¶¶ 11–12, 14 (holding that when officer conceded that he could have concluded traffic stop after conducting records check, but nonetheless asked driver to exit vehicle for sole purpose of facilitating further investigatory conversation, officer took "detour" within meaning of *Rodriguez* that "amount[ed] to an additional seizure").

¶18 Further, after Trooper Aguilera ultimately obtained Shaw's signature—at which point the state concedes the mission of the traffic stop was complete—he immediately asked Shaw for consent to search. But he did *not* first provide the warning or return the driver's licenses and registration—a critical fact that the superior court misapprehended. By retaining the licenses and registration while asking for Shaw and Malloy's consent, Trooper Aguilera ensured that they were not free to leave and continued their detention beyond the scope of the traffic stop.

¶19 The continued detention was not supported by consent or independent reasonable suspicion of criminal activity. Malloy's consent to the dog sniff (which was not even required) did not amount to consent to prolonged detention. Though "[r]easonable suspicion is something short

of probable cause, . . . it must be more than an 'inchoate and unparticularized suspicion or "hunch."'" *Sweeney*, 224 Ariz. at 112, ¶ 21 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer must have "some minimal, *objective* justification for the detention." *Id.* Though we must consider the totality of the circumstances, including the officer's knowledge, experience, and training, "circumstances that do not reliably distinguish between suspect and innocent behaviors are insufficient to establish reasonable suspicion because they may cast too wide a net and subject all travelers to 'virtually random seizures.'" *Id.* at 112–13, ¶ 22.

¶20 The state places great weight on Malloy's nervousness as supporting a reasonable suspicion of criminal activity. Though the state concedes that "[o]ften a person's nervousness is not a particularly weighty factor in determining whether a reasonable suspicion exists," it contends that Shaw's comments during the stop about Malloy's nervousness "confirmed that Malloy was *exceptionally* nervous." We cannot agree with the state's contention.

¶21 Trooper Aguilera's assessment that Malloy was "nervous" is supported by the body-camera footage, which shows that her hand was shaking and that Shaw told her jokingly twice to calm down. But we detect no objective indicia of "exceptional" nervousness in the footage. Next, with respect to the information that Trooper Aguilera learned during the records check—i.e., that the vehicle had some characteristics consistent with drug trafficking—the state concedes, and we agree, that the information is of "minimal weight." The fact that a paid-off vehicle recently registered in Arizona has crossed the Mexican border several times is not a reliable indicator of criminal activity. Similarly, despite the state's contention to the contrary, the fact that a person has chosen to drive rather than fly when taking a short, limited-purpose trip to a distant destination is not a reliable indicator of criminal activity. The state finally points out that Shaw stammered when Trooper Aguilera first asked the couple where they were traveling from, and that Malloy was vague when she later described the trip's duration and travel time. But though these facts, combined with the totality of the other circumstances, may have been sufficient to support some level of unparticularized suspicion of criminal activity, we hold that they were insufficient to establish reasonable suspicion.[2] *Cf. Sweeney*, 224

---

[2] We further note that even if we considered the information obtained during the unlawful questioning of Shaw at the patrol car, the facts were insufficient to create reasonable suspicion. The additional information was: Shaw identified the vehicle the couple claimed to have traveled to see by a

Ariz. at 113, ¶ 24 ("A reasonably prudent person's suspicions would not be raised after observing a foreign national driving a clean, deodorized rental car with an atlas on the passenger seat, who upon being stopped and questioned outside in the three-degree weather by the police, failed to articulate with specificity the places he had visited while staying in an unfamiliar city. A holding to the contrary would subject nearly everyone to a continued, intrusive detention following a routine traffic stop.").

¶22 It was in the context of the unlawful detention that Trooper Aguilera obtained Shaw's consent to a search of his bags and Malloy's consent to a dog sniff of the vehicle. We therefore must decide whether the unlawful detention invalidated the consent. "Evidence seized following consent to a search must be suppressed if the consent is tainted by a prior constitutional violation." *State v. Guillen*, 223 Ariz. 314, 317, ¶ 13 (2010); *see also Florida v. Royer*, 460 U.S. 491, 507–08 (1983) ("Because we affirm the . . . conclusion that Royer was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search."). "Even assuming voluntary consent, 'the evidence found as a result of that consent must be suppressed if the unconstitutional conduct . . . is not sufficiently attenuated from the subsequent seizure.'" *State v. Monge*, 173 Ariz. 279, 281 (1992). Attenuation is measured by: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) 'particularly, the purpose and flagrancy of the official misconduct.'" *Guillen*, 223 Ariz. at 317, ¶ 14 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). The third factor is the most important. *See State v. Hummons*, 227 Ariz. 78, 81, ¶ 14 (2011). "Factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the

---

slightly different year than previously stated; Shaw said the couple had no family or friends in Arkansas, whereas Malloy had said Shaw viewed the vehicle with a friend; and Shaw could not remember the name of the hotel where the couple had stayed. Innocent travelers may well misstate a vehicle model year and fail to recall the name of a hotel, and Shaw's statement that the couple had no family or friends in Arkansas was not necessarily inconsistent with Malloy's statement that he had seen the vehicle with a friend. Moreover, even viewing the vagueness and inconsistencies in Shaw's statements as creating further grounds to suspect criminal activity, we cannot say that the totality of the facts supported reasonable suspicion.

objective appearance of consent may all be important in this inquiry." *Id.* at 82, ¶ 14.

¶23 We hold that even if Shaw and Malloy's consent was voluntary, their consent was tainted by the unlawful detention because the detention was not sufficiently attenuated from the seizure. The time elapsed was short, and there were no intervening circumstances. Moreover, though the incomplete record prevents a fulsome evaluation of Trooper Aguilera's motives, the law clearly forbade his extension of the detention both when he asked further questions of Shaw and when he asked for the consent. Further, his testimony tends to support the conclusion that he deliberately extended the detention for the purpose of conducting an investigation separate from the traffic stop—he testified that his customary request that drivers exit their vehicles is at least partially based on his desire to "talk to the occupants a little bit more," and he testified that he intended to ask Malloy questions about her trip even before she asked his age.

¶24 Contrary to the dissent's view, we do not adopt a novel standard here about precluding officers from talking to drivers when they are issuing a warning or citation. Instead, we apply well-established principles that (1) a driver must be allowed to leave when the mission for the stop has, or should have been, completed; and (2) after that point, the stop cannot be prolonged unless the encounter becomes consensual or reasonable suspicion of criminal activity justifies continued detention. *See Kjolsrud*, 239 Ariz. at 322–23, ¶ 10. Similar to the dissent, the state attempts to justify the continued detention because it was brief and not unreasonable, essentially asking us to conclude that any excessive delay caused by Trooper Aguilera's questions that occurred after the stop should have been completed was de minimis. We decline to do so because that position was rejected in *Rodriguez*. *See Rodriguez*, 455 U.S. at 355 (holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures").

## CONCLUSION

¶25 Trooper Aguilera unlawfully prolonged the detention occasioned by the traffic stop both when he questioned Shaw about unrelated matters before permitting him to sign the warning and when he asked Shaw and Malloy for consent to search after obtaining Shaw's signature but before returning the couple's driver's licenses and the vehicle registration. Both Shaw and Malloy's consents were tainted by the

unlawful detention. We therefore reverse the superior court's denial of Malloy's motion to suppress, and we remand for all necessary further proceedings.

**W I L L I A M S**, Judge, dissenting:

¶26 The majority summarizes nicely the facts in the record before us, and accurately notes, *supra* ¶ 12, that this court gives "deference to the superior court's factual findings," so long, of course, as they are "reasonably supported by the evidence." *State v. Adair*, 241 Ariz. 58, 60, ¶ 9 (2016). Relying upon *State v. Sweeney*, 224 Ariz. 107, 111, ¶ 12 (App. 2010), the majority also states that this court "independently review[s] the body-camera footage of the encounter that Malloy provided at the suppression hearing." And while I don't disagree with that statement, I think it is worth noting, for clarity, that this court only does so, as with all record evidence, to determine whether the superior court's factual findings are, again, "reasonably supported by the evidence." *Adair*, 241 Ariz. at 60, ¶ 9. In other words, nothing about *Sweeney* addressed, or changed, our review of video evidence from deferential to de novo.

¶27 The dispositive issue before us is whether the Trooper's actions impermissibly extended the traffic stop beyond the time needed to reasonably complete his mission. *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). The majority's view is that, up until the Trooper asked Shaw to exit Malloy's vehicle and sign the warning while standing outside of the Trooper's vehicle, the traffic stop had "not [been] an unreasonably long encounter." I agree. And I agree with the majority that the Trooper's "further questions about [Shaw's] trip" after signing the warning "did not significantly extend the duration" of the traffic stop. But I disagree with the majority's view that the traffic stop became unlawful when the Trooper questioned Shaw after Shaw had signed the warning because the Trooper did not "first provide the warning or return the driver's licenses and registration" *before* asking for consent to search the vehicle.

¶28 A review of the video recording shows that the Trooper first made contact with Shaw and Malloy seventeen seconds after initiating the traffic stop. Ten minutes and twenty seven seconds later, Shaw signed the warning on the Trooper's handheld computer. But the warning still needed to be printed and given to Shaw, and the licenses and registration needed to be returned to Shaw and Malloy. As the warning was being printed, the

Trooper began asking Shaw a few more questions. It is not clear from the video recording, nor from other record evidence, at what point the warning had finished printing and was ready to be handed to Shaw. Indeed, the court does not make any factual finding regarding the same. But it is clear that the Trooper's questions to Shaw lasted a matter of seconds, not minutes, and began to be asked while the warning was printing. Shaw voluntarily answered those questions. Thirty seconds after signing the warning, when the Trooper asked to search the vehicle, Shaw directed the Trooper to inquire of Malloy. Ten seconds later, Shaw consented to a search of his belongings. Malloy, similarly, within seconds of being asked, consented to a K-9 exterior sniff of her vehicle.

¶29        The court found that once Shaw signed the warning, "[Shaw] was asked for consent to search," and "did give the [Trooper] consent to search [his] belongings within the car." Shaw also directed the Trooper to Malloy, "who was the owner of the car . . . for permission to search [the car]." These findings are reasonably supported by the record. The court also found that "the body cam video clearly shows that consent was freely and voluntarily given, without any illegal show of force." That finding is also reasonably supported by the record evidence and, in my view, one this court should give deference to. *See*, *e.g. Teagle*, 217 Ariz. at 22, ¶ 19; *see also State v. Rodriguez*, 1 CA-CR 18-0127, 2019 WL 1785298, at *3, ¶ 14 (Ariz. App. Apr. 23, 2019) (mem. decision) ("But an officer's brief questioning after issuing a traffic violation warning can be a permissible consensual encounter if the driver agrees to answer questions.").

¶30        It is also well settled that there is no hard and fast limit for gauging the reasonableness of length of the detention. *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (noting *United States v. Place*, 462 U.S. 696 (1983) "expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop."). In my view, the majority's approach promotes a standard that law enforcement officers are now somehow precluded from continuing to converse with a driver once the driver has signed a warning if the printed warning, license, and registration have not *first* been returned to a driver. This is novel. And the majority's conclusion that the Trooper "measurably" extended an otherwise "not [] unreasonably long encounter" by asking a few, brief follow up questions, which began while the warning was being printed, that lasted a matter of seconds, and which were voluntarily answered, is, in my view, at odds with longstanding caselaw defining Fourth Amendment violations as those which are prolonged beyond the time *reasonably* required to complete a traffic mission. *See Rodriguez*, 575 U.S. at 349 (2015) ("Authority for the seizure ends when tasks tied to the traffic infraction are—*or reasonably*

*should have been*—completed.") (emphasis added); *see also Caballes*, 543 U.S. at 408 (2005) (holding that a traffic stop "become[s] unlawful if it is prolonged beyond the time *reasonably* required to complete th[e] mission" of the traffic stop) (emphasis added). While I agree that questions lasting only seconds, as were asked here, can be "measured" in time, I do not believe the superior court's factual findings that the encounter became consensual should be so easily set aside by this court on this record.

¶31          In my view, the superior court's order denying Malloy's motion to suppress should be affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AA