IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

———————————————

THE STATE OF ARIZONA,
*Appellee*,

*v.*

DALE LEE EVANS,
*Appellant*.

No. 2 CA-CR 2013-0342
Filed July 31, 2014

———————————————

Appeal from the Superior Court in Cochise County
No. CR200500455
The Honorable Wallace R. Hoggatt, Judge

**AFFIRMED**

———————————————

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Amy Pignatella Cain, Assistant Attorney General, Tucson
*Counsel for Appellee*

Joel A. Larson, Cochise County Legal Defender, Bisbee
*Counsel for Appellant*

**OPINION**

Judge Vásquez authored the opinion of the Court, in which Presiding Judge Kelly and Judge Olson[1] concurred.

V Á S Q U E Z, Judge:

¶1    After a jury trial, appellant Dale Evans was convicted in absentia of possession of marijuana, possession of drug paraphernalia, and aggravated driving under the influence pursuant to A.R.S. §§ 28-1381(A)(3) and 28-1383(A)(1).[2] The trial court later sentenced him to concurrent, presumptive terms of imprisonment, the longest of which is 2.5 years. On appeal, Evans contends the court erred in denying his motion to suppress all evidence obtained from the traffic stop that led to his arrest. Relying on *Terry v. Ohio*, 392 U.S. 1, 20, 30 (1968), he asserts the stop was "not justified at its inception" because Cochise County Sheriff's deputies lacked "an articulable, reasonable suspicion, based on the totality of the circumstances, that [he was] involved in criminal activity." For the following reasons, we affirm Evans's convictions and sentences.

¶2    "In reviewing the denial of a motion to suppress evidence, we consider only the evidence presented at the suppression hearing, and view that evidence in the light most favorable to upholding the trial court's ruling." *State v. Olm*, 223

---

[1]The Hon. Robert Carter Olson, a retired judge of the Arizona Superior Court, is called back to active duty to serve on this case pursuant to orders of this court and the supreme court.

[2] The trial court's sentencing minute entry erroneously indicates Evans was convicted pursuant to a guilty plea. By this decision, we correct the minute entry to reflect his conviction after a jury trial. *See State v. Ovante*, 231 Ariz. 180, ¶ 38, 291 P.3d 974, 982 (2013) (appellate court may correct sentencing minute entry where error is clear from record).

Ariz. 429, ¶ 2, 224 P.3d 245, 247 (App. 2010) (citation omitted). We "give deference to the trial court's factual findings, including findings regarding [an officer's] credibility and the reasonableness of inferences that he drew, but we review *de novo* the trial court's ultimate legal determination." *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118, 927 P.2d 776, 778 (1996).

**Relevant Background**

¶3        At the hearing on Evans's motion to suppress, Deputy Dana Anderson testified that his duties included "[p]atrol, DUI investigation, . . . [and] booking people in jail" and agreed that he was "[b]asically a uniformed officer out on the street." He stated he had been the passenger in a marked patrol car on an afternoon in November 2004 when, at about four o'clock, he had seen a truck parked "right at the stop sign" of an intersection in an area "known for illegal immigrant activity . . . [and] marijuana hauling." When he looked at the vehicle, he saw the driver turned in his seat and "[f]lailing his arms towards the passenger" with closed fists. Anderson demonstrated the movements for the court and said he told his partner, "[H]ey, we might have a rolling domestic violence . . . pull over and turn around." After his partner returned their patrol car to the intersection and turned around, the truck pulled out in front of them, and the deputies initiated the traffic stop.

¶4        On cross-examination, Anderson estimated that the patrol car had been travelling at fifty-five miles an hour, that he was twenty-five to thirty feet from the intersection when the driver's actions "caught the corner of [his] eye," and that he observed the driver for "four or five seconds." He stated he had seen the driver make three arm movements toward the vehicle's passenger, which he described as "[l]eft, right, left," but had not seen any contact made, "just . . . arms."

¶5        At the close of the hearing, the trial court agreed with Evans that it was unlikely Anderson had observed the driver for as much as four or five seconds. Rather, based on Anderson's testimony, the court found his observations of Evans's arm

movements lasted "closer to a second-and-a-half or a second than . . . to four or five seconds." The court then stated,

> But, in any event, I believe, based on the evidence presented, that the arm movements, though they might not have been criminal activity, were articulable facts that justified the Officers in trying to find out more.
>
> . . . .
>
> . . . [T]here was a lot that [Anderson] didn't know, but it wasn't as if [he] looked at the vehicle and decided based on a hunch that there was something afoot. He saw arm activity that might have been consistent with some domestic violence assault, and I think that the officers were justified in investigating further by stopping the vehicle, after it apparently started up.

Accordingly, the court denied Evans's motion to suppress.

## Discussion

¶6        Evans contends Anderson's limited observations of Evans's arm movements "formed the sole basis for the stop." He argues those observations were insufficient to give rise to the reasonable suspicion required by *Terry*, and, citing this court's decision in *State v. Fornof*, 218 Ariz. 74, 179 P.3d 954 (App. 2008), he suggests the probative value of Anderson's observations was "undermine[d]" by the state's failure to elicit evidence of his training or experience or of the "significance of the surrounding circumstances such as the location, the time of day, and the physical appearance of the individuals involved." He also relies on *United States v. Foreman*, 369 F.3d 776 (4th Cir. 2004), to argue Anderson's "extremely fleeting observation of movements which [were] ambiguous at best fails to eliminate that substantial portion of the

innocent motoring public necessary [to establish] a reasonable suspicion" for the investigative stop. *See id.* at 781. He posits that the arm movements Anderson saw may have been consistent with the driver gesticulating while telling a story, waving away an insect inside the passenger compartment, extinguishing a match, dancing to a musical beat, or using American Sign Language.

¶7 A law enforcement officer's investigatory stop of a vehicle constitutes a seizure under the Fourth Amendment and "must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity." *State v. Richcreek*, 187 Ariz. 501, 503-04, 930 P.2d 1304, 1306-07 (1997), *quoting United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*Sokolow II*) (investigatory stop permissible when based on "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'"), *quoting Terry*, 392 U.S. at 30. "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted), *quoting Terry*, 392 U.S. at 27. And "reasonable suspicion" is a "commonsense, nontechnical concept[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996), *quoting Illinois v. Gates*, 462 U.S. 213, 231 (1983); *cf. Terry*, 392 U.S. at 27 (pat-down search after investigatory stop permissible if "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger").

¶8 In reviewing a claim that law enforcement officers lacked the reasonable suspicion required for an investigatory stop, we "apply 'a peculiar sort of *de novo* review,' slightly more circumscribed than usual, because we defer to the inferences drawn by the [trial] court and the officers on the scene, not just the [trial] court's factual findings." *United States v. Valdes-Vega*, 738 F.3d 1074, 1077 (9th Cir. 2013) (citation omitted), *quoting Arvizu*, 534 U.S. at 278 (Scalia, J., concurring). As the Supreme Court has explained,

> A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.

*Ornelas*, 517 U.S. at 699. A reviewing court must consider whether the historical facts, along with the inferences drawn by law enforcement officers and the trial court, satisfy the constitutional standard. *Id.* at 696-97, 699. The need for such deference is rarely more apparent where, as in this case, an officer testifies it was a defendant's physical actions that aroused suspicions, and the trial court has relied on the officer's in-court demonstration of those actions to determine the stop was reasonable. *See Arvizu*, 534 U.S. at 276 (noting trial court's "superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom"; appellate court "should not have casually rejected" testimony about and demonstration of conduct officer found suspicious).

¶9        Evans is correct that, in reviewing a Fourth Amendment claim involving a *Terry* stop, a court must consider whether, given the "'totality of the circumstances,'" the officer had "a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273, *quoting Cortez*, 449 U.S. at 417-18. In *Fornof*, for example, we considered "such objective factors as the suspect's conduct and appearance, location, and surrounding circumstances, such as the time of day, . . . taking into account the officer's relevant experience, training, and knowledge." 218 Ariz. 74, ¶ 6, 179 P.3d at 956. And here, although Anderson indicated his decision to stop Evans had been influenced, in part, by the fact that the truck was parked "right at the stop sign" in an area known for criminal activity, we agree that his suspicion was based primarily on his observations of Evans "flailing" his fists toward the truck's passenger.

¶10 But Evans appears to read our decision in *Fornof* too broadly in arguing the evidence was insufficient because the state failed to elicit "the relevant experience, training and knowledge of the officer involved." In *Fornof*, we identified certain objective circumstances that were relevant to the legality of a *Terry* stop under the facts of that case. 218 Ariz. 74, ¶¶ 6-11, 179 P.3d at 956-57 (inquiry into whether officer possessed reasonable suspicion "is fact specific"). But we did not intend to suggest that a law enforcement officer may only establish a reasonable basis for his or her suspicion by accounting for each of these circumstances in every case involving an investigatory stop. *See State v. Ramsey*, 223 Ariz. 480, ¶ 23, 224 P.3d 977, 982 (App. 2010) (facts proffered as basis for reasonable suspicion "must be considered in the context of the totality of all the *relevant* circumstances") (emphasis added). Evidence of Anderson's training and experience, in domestic violence cases or generally, was not critical in determining whether his particular observations in this case were sufficient to establish reasonable suspicion.

¶11 The Supreme Court repeatedly has cautioned that Fourth Amendment analysis is not amenable to such a formulaic approach. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (to determine "reasonableness" under the Fourth Amendment, Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature" of the inquiry); *Sokolow II*, 490 U.S. at 7 (concept of reasonable suspicion "not 'readily, or even usefully, reduced to a neat set of legal rules'"), *quoting Gates*, 462 U.S. at 232; *Adams v. Williams*, 407 U.S. 143, 147 (1972) ("One simple rule will not cover every situation."); *Terry*, 392 U.S. at 30 ("Each case of this sort will, of course, have to be decided on its own facts."). Thus, while recognizing the need to consider "'the totality of the circumstances—the whole picture'"—to determine whether an investigatory stop was based on a reasonable suspicion of criminal activity, the Court has concluded, "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop,'" without regard to the law enforcement officer's professional experience or other factors that might be relevant in a

different context. *Navarette v. California*, ___ U.S. ___, ____, 134 S. Ct. 1683, 1687-88 (2014), *quoting Cortez*, 449 U.S. at 417, *and Alabama v. White*, 496 U.S. 325, 327 (1990) (second alteration in *Navarette*).

¶12        In this case, Anderson saw Evans flailing his closed fists toward the truck's passenger in a manner suggestive of—or at least consistent with—an assault. As the trial court observed, although Anderson's first thought was the possibility of "rolling domestic violence," the gender or identity of the passenger was irrelevant to the deputy's suspicion that a violent crime was occurring or was about to occur. The cause for his suspicion simply did not depend on specialized training, beyond his experience as a patrol officer, or other factors, such as the time of day, that might be relevant in a different case. *See, e.g.*, *Fornof*, 218 Ariz. 74, ¶¶ 17-18, 179 P.3d at 958-59 (reasonable suspicion of drug exchange based on multiple factors, including location and lateness of hour).

¶13        Evans recognizes that "[t]he inquiry into whether an officer possessed reasonable suspicion is fact specific." But, relying primarily on *Reid v. Georgia*, 448 U.S. 438 (1980), and *Foreman*, he maintains Deputy Anderson's "singular and fleeting" observations "do[] not reliably distinguish between suspect and innocent behavior, and similarly fail[] to eliminate a substantial portion of innocent travelers." Evans's reliance on *Reid* and *Foreman* is misplaced.

¶14        *Reid* was one of the first cases in which the Supreme Court considered law enforcement's reliance on a "drug courier profile" to make investigatory stops of persons at an airport. 448 U.S. at 440-41. In that case, a Drug Enforcement Administration (DEA) agent stopped Reid outside a Georgia airport because he had (1) arrived from Fort Lauderdale, which the agent described as "a principal place of origin of cocaine"; (2) arrived early in the morning, "when law enforcement activity is diminished"; (3) walked in front of another person and occasionally looked back at him as the two walked through the airport; and, (4) "they apparently had no luggage other than their shoulder bags." *Id.*

¶15      The Court concluded the agent had lacked reasonable suspicion for the stop because only two of the four factors related to Reid's "particular conduct" and the other factors "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* at 441. But, the Court's admonition did not create a new standard for determining reasonable suspicion. Indeed, the Court noted that "[a]lthough there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, this is not such a case." *Id.* (citation omitted).

¶16      Evans also relies on the Fourth Circuit's statement in *Foreman* that "*Sokolow* teaches us that . . . [t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." 369 F.3d at 781. As Evans points out, this court previously has cited this statement with approval. *See State v. Sweeney*, 224 Ariz. 107, ¶ 22, 227 P.3d 868, 874 (App. 2010); *State v. Teagle*, 217 Ariz. 17, ¶ 25, 170 P.3d 266, 273 (App. 2007). Upon closer review, however, we question whether it is a correct statement of the law to the extent it articulates a standard not present in *Sokolow II*. The cited language is not derived from the Supreme Court's own discussion of the issues raised in *Sokolow*; instead, it resembles the Ninth Circuit's holding, which the Supreme Court reversed. *Sokolow II*, 490 U.S. at 6-7, 10, *rev'g United States v. Sokolow*, 831 F.2d 1413 (9th Cir. 1987) (*Sokolow I*).

¶17      In *Sokolow I*, a divided panel of the Ninth Circuit reversed the defendant's conviction for cocaine possession, concluding DEA agents had lacked reasonable suspicion to stop him at an airport. 831 F.2d at 1415-16, 1423. In considering the Court's admonition in *Reid*, the majority stated that a law enforcement officer who justifies a *Terry* stop by reference to aspects of a profile "shared by drug couriers and the public at large" also "must testify that [such] pattern of behavior, otherwise explicable as innocent behavior, does not exist in a significant number of innocent people." *Sokolow I*, 831 F.2d at 1420. But the Supreme Court rejected this additional requirement, emphasizing, as it has repeatedly, that

reasonable suspicion is dependent on the totality of the circumstances in a particular case. *Sokolow II*, 490 U.S. at 8; *see also Ornelas*, 517 U.S. at 696 (reasonable suspicion "fluid concept[]" that takes "substantive content from the particular contexts" of its application). The Court explained that the Ninth Circuit majority had "divided the facts bearing on reasonable suspicion into two categories": those "describing 'ongoing criminal activity,' such as the use of an alias or evasive movement through an airport" and those "describing 'personal characteristics' of drug couriers, such as the cash payment for tickets, a short trip to a major source city for drugs, nervousness, type of attire, and unchecked luggage." *Sokolow II*, 490 U.S. at 6, *quoting Sokolow I*, 831 F.2d at 1419-20. The Court continued,

> The majority believed that such [personal] characteristics, "shared by drug couriers and the public at large," were only relevant if there was evidence of ongoing criminal behavior and the Government offered "[e]mpirical documentation" that the combination of facts at issue did not describe the behavior of "significant numbers of innocent persons."

*Id.*, *quoting Sokolow I*, 831 F.2d at 1420 (second alteration in *Sokolow II*).

¶18 The Supreme Court concluded the Ninth Circuit's "effort to refine and elaborate the requirements of 'reasonable suspicion' in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment": "In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.'" *Id.* at 7-8, *quoting Cortez*, 449 U.S. at 417. The Court added, "'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the

same—and so are law enforcement officers.'" *Id.* at 8, *quoting Cortez*, 449 U.S. at 418.

**¶19**  Thus, the Fourth Circuit's conclusion in *Foreman* that an investigatory stop violates the Fourth Amendment unless the factors causing an officer's suspicion of criminal activity, taken together, "serve to eliminate a substantial portion of innocent travelers" is inconsistent with the Court's reasoning in *Sokolow II*. *Foreman*, 369 F.3d at 781. It also is inconsistent with the greater weight of authority that holds, "When determining whether reasonable suspicion exists, the police are not required to rule out the possibility of innocent explanations for a defendant's conduct." *Ramsey*, 223 Ariz. 480, ¶ 23, 224 P.3d at 982; *see also Arvizu*, 534 U.S. at 277 (determination reasonable suspicion exists "need not rule out the possibility of innocent conduct"); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation"; stop permissible "to resolve the ambiguity"). Under *Sokolow II*, the "relevant inquiry" to determine whether a stop was supported by reasonable suspicion "'is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts.'" *Sokolow II*, 490 U.S. at 10, *quoting Gates*, 462 U.S. at 243 n.13.

**¶20**  Like the Ninth Circuit's decision in *Sokolow I* on which it appears to be based, the Fourth Circuit's apparent rule in *Foreman* would "create[] unnecessary difficulty," *Sokolow II*, 490 U.S. at 7, were courts and law enforcement officers bound to apply it. As the Court cautioned in *Wardlow*, neither police officers nor the courts are privy to "empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists." 528 U.S. at 124-25. Before making an investigatory stop, a police officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. It seems unreasonable to demand that the same officer, before acting on his particularized suspicion, must also consider the number of innocent travelers who might engage in similar behaviors, under similar circumstances, and whether his

suspicions serve to eliminate a substantial portion of those innocent persons. *See Wardlow*, 528 U.S. at 123 ("the Fourth Amendment requires at least a minimal level of objective justification for making the stop"; defendant's flight in high-crime area gave rise to reasonable suspicion).

¶21 An officer must, of course be able to identify objective, particular facts that led to his suspicions, and he may not stop a person to investigate a mere hunch. In that process, he necessarily must be mindful of circumstances that may "describe a very large category of presumably innocent travelers." *Reid*, 448 U.S. at 441; *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 885-87 ("apparent Mexican ancestry" of vehicle's occupants, standing alone, "would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country"). Under existing Supreme Court standards, a stop based on such factors alone would be invalid because the circumstances provide no "'particularized'" basis for suspicion. *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1687 ("brief investigative stops" permitted when officer "has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity'"), *quoting Cortez*, 449 U.S. at 417-18.

¶22 We see no need to adopt the Fourth Circuit's additional requirement that every stop be supported by testimony regarding how the factors "serve to eliminate" innocent conduct. *Foreman*, 269 F.3d at 781. As addressed above, we question the validity of this standard and, as this case illustrates, such a requirement may cause confusion about what is needed to establish that an investigatory stop was reasonable under the Fourth Amendment.

¶23 Thus, we conclude Deputy Anderson was not required, before stopping Evans's vehicle, to rule out the possibility that the arm movements he observed were consistent with swatting at an insect or "play[ing] air guitar," as Evans has argued. Nor do the circumstances here "describe a very large category of presumably innocent travelers," as did the circumstances in *Reid,* 448 U.S. at 441, on which Evans also relies.

¶24 In sum, after giving due weight to the trial court's factual findings and related inferences, we concur with its conclusion that the deputies were justified in stopping Evans to investigate a reasonable suspicion of criminal activity based on Anderson's observations. The investigatory stop did not violate the Fourth Amendment.

## Disposition

¶25 We affirm Evans's convictions and sentences.