IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

———————————————

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ASALIA GUADALUPE ALVAREZ-SOTO,
*Appellant*.

No. 2 CA-CR 2023-0200
Filed October 21, 2024

———————————————

Appeal from the Superior Court in Pinal County
No. S1100CR201703501
The Honorable Jason R. Holmberg, Judge

**VACATED AND REMANDED**

———————————————

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Jacob R. Lines, Assistant Attorney General, Tucson
*Counsel for Appellee*

Rosemary Gordon Pánuco, Tucson
*Counsel for Appellant*

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Chief Judge Staring concurred and Presiding Judge Gard dissented.

E C K E R S T R O M, Judge:

**¶1**        Asalia Alvarez-Soto appeals from her convictions and sentences for possession and transportation of marijuana for sale. Specifically, she contends the trial court erred in denying her motion to suppress the evidence seized from the vehicle she was driving because law enforcement lacked reasonable suspicion to conduct a traffic stop. For the following reasons, we agree. We therefore vacate Alvarez-Soto's convictions and sentences and remand for further proceedings.

**Factual and Procedural Background**

**¶2**        On review of a trial court's ruling on a motion to suppress, we consider only evidence presented at the suppression hearing, viewing that evidence "in the light most favorable to sustaining the ruling." *State v. Naranjo*, 234 Ariz. 233, ¶ 4 (2014); *see also State v. Becerra*, 239 Ariz. 90, ¶ 2 (App. 2016). In 2018, Arizona Department of Public Safety Trooper Ashton Shewey saw a sedan driving in the Pinal County area that had a "newer" license plate registered in the border city of Nogales. A check of the license plate revealed that the sedan had recently crossed the United States-Mexico border multiple times. Because these details, taken together, fit the profile of a vehicle used to transport drugs across the border, Shewey "ma[d]e a decision that [he was] going to attempt to conduct a traffic stop."

**¶3**        Trooper Shewey began to follow the sedan, which Alvarez-Soto was driving in the middle of three lanes on Interstate 10. Shewey first observed the sedan traveling three miles per hour above the posted speed limit of seventy-five miles per hour. After "several minutes, several miles," it "slowed down to 70." When Alvarez-Soto slowed down, a red SUV driving in the right-hand lane that she had been pacing overtook her on the right. Because Arizona law requires slower traffic to remain in the right-hand lane, Shewey determined he had sufficient grounds to stop the sedan for a traffic violation.

**¶4**        Alvarez-Soto initially gave Trooper Shewey verbal consent to search the sedan, but after reading the consent form she revoked her

permission. Shewey then asked Alvarez-Soto if he could "run [his] canine around the vehicle," and she consented. The dog alerted to the presence of a drug at the front driver's side of the sedan. Officers subsequently searched the vehicle and discovered a suitcase in the trunk that contained bundles of marijuana.

¶5        The state charged Alvarez-Soto with one count of possession of marijuana for sale and one count of transportation of marijuana for sale. Before trial, she moved to suppress the evidence gathered during the search of the sedan, arguing, among other things, that Trooper Shewey had lacked reasonable suspicion to conduct a traffic stop. After holding a hearing, the trial court denied the motion, reasoning that "the stop was justified." The court made no further factual findings as to the initial traffic stop.

¶6        In March 2019, at the conclusion of a two-day trial that Alvarez-Soto did not attend, a jury found her guilty on both counts. She was not sentenced until March 2022, nearly three years after her trial. At that time, the trial court sentenced her to two concurrent, presumptive terms of five years' imprisonment. In August 2023, Alvarez-Soto filed a delayed notice of appeal, as provided by Rule 31.2(a)(3), Ariz. R. Crim. P. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

**Discussion**

¶7        On appeal, Alvarez-Soto contends the trial court erred in denying her motion to suppress because Trooper Shewey had no reasonable suspicion to initiate a traffic stop. In particular, she argues that driving "at and around the speed limit in the middle lane of I-10" is not a violation of A.R.S. § 28-721(B), which requires vehicles driving more slowly than the surrounding traffic to drive in the right-hand lane. She thus maintains the court erred in denying her motion to suppress the evidence gathered as a result of that stop.

¶8        "We review the denial of a motion to suppress for an abuse of discretion." *State v. Majalca*, 251 Ariz. 325, ¶ 11 (App. 2021). This includes our review of the trial court's credibility determinations, *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118 (1996). However, "[w]hether there is a sufficient legal basis to justify a stop of a vehicle is a mixed question of fact and law," and we review de novo the court's legal determinations, including its ultimate determination of whether reasonable suspicion supported the stop. *State v. Evans*, 237 Ariz. 231, ¶ 6 (2015); *see also State v. Kjolsrud*, 239 Ariz. 319, ¶ 8 (App. 2016).

¶9        The Fourth Amendment prohibits unreasonable searches and seizures.  *See* U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8 (1968).  Because a traffic stop is a seizure within the meaning of the Fourth Amendment, an officer must have "reasonable suspicion that a traffic violation has occurred to initiate a stop."  *State v. Sweeney*, 224 Ariz. 107, ¶ 16 (App. 2010); *see also Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  We evaluate whether such reasonable suspicion exists based on the totality of the circumstances, taking into account the "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act."  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also Ornelas v. United States*, 517 U.S. 690, 695-96 (1996) (applying standard to reasonable suspicion calculus).

¶10        "An officer who has observed a traffic violation has reasonable suspicion to initiate a traffic stop."  *Majalca*, 251 Ariz. 325, ¶ 12; *see also Kjolsrud*, 239 Ariz. 319, ¶ 9.  The officer must be able to articulate the reasons, "based on the totality of the circumstances," that suggest a traffic violation has occurred.  *State v. Teagle*, 217 Ariz. 17, ¶ 20 (App. 2007).  "We assess the totality of the circumstances from the perspective of 'an objectively reasonable police officer' in evaluating the validity of the stop."  *State v. Moreno*, 236 Ariz. 347, ¶ 12 (App. 2014) (quoting *Ornelas*, 517 U.S. at 696).  In so doing, we take into account "both 'objective factors' and 'surrounding circumstances,'" including "the officer's relevant experience, training, and knowledge."  *Id.* (quoting *State v. Fornof*, 218 Ariz. 74, ¶ 6 (App. 2008)).  In making these assessments, we defer to the inferences drawn by the trial court and the officers on the scene.  *State v. Evans*, 235 Ariz. 314, ¶ 8 (App. 2014).  But, we conduct an independent review of any video evidence because the trial court is in no better position to evaluate such evidence than this court.  *Sweeney*, 224 Ariz. 107, ¶ 12; *see also State v. Morris*, 246 Ariz. 154, n.2 (App. 2019).

¶11        Our deference is not unlimited.  The express terms of the United States Constitution require our courts to vigilantly protect each person's right to be free from unreasonable governmental searches.  Every traffic stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  Observations that do not reliably distinguish between innocent and unlawful behaviors do not establish reasonable suspicion because "they may cast too wide a net and subject all travelers to 'virtually random seizures.'"  *Sweeney*, 224 Ariz. 107, ¶ 22 (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).  As we have previously held, "[w]hen officers make

traffic stops based on facts that neither constitute a violation of the law nor constitute reasonable grounds to suspect the driver has committed an offense, they run afoul of the Fourth Amendment requirement that they possess objectively reasonable grounds for the intrusion." *State v. Livingston*, 206 Ariz. 145, ¶ 9 (App. 2003).

¶12 At the suppression hearing, Trooper Shewey testified that he had stopped Alvarez-Soto because a vehicle overtook her on the right. He testified that traffic had been "medium to light," with "several vehicles around" Alvarez-Soto. He noted that Alvarez-Soto had been traveling slightly above the posted speed limit of seventy-five miles per hour when he began to pace her, but "just before" he stopped her, she slowed to seventy miles per hour.[1] Shewey later reiterated that he had decided he had reasonable suspicion to conduct a traffic stop when he saw the red SUV pass Alvarez-Soto on the right and because her speed "fluctuate[d] from 78 to about 70."

¶13 The state avers that "the video evidence in this case" corroborated Trooper Shewey's testimony that Alvarez-Soto had violated § 28-721(B). That statute provides in relevant part:

> On all roadways, a person driving a vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall drive the vehicle in the right-hand lane then available for traffic . . . except when overtaking and passing another vehicle proceeding in the same direction . . . .

---

[1]Although Trooper Shewey testified that Alvarez-Soto drove slightly above the speed limit at various points, the evidence before the trial court at the time of the suppression hearing made clear that the traffic stop was not based on a violation of any statute mandating vehicles drive at or below the posted speed limit. *See* A.R.S. § 28-702.04. The written warning lists Alvarez-Soto's speed at approximately seventy miles per hour and cites only a violation of § 28-721(B), failure to drive on the right side of the road while traveling at a slow speed. Likewise, in his post-incident report, Shewey noted only that he "conducted a traffic stop . . . for slower traffic to the right."

¶14       In essence, Trooper Shewey's testimony provides one plausible cue relevant to determining whether Alvarez-Soto violated this provision:  as she reduced her speed from seventy-eight miles per hour, with a police vehicle approaching her on her left, a vehicle to her right, which she had been pacing at that speed, surged ahead.[2]  Shewey offered no testimony that he had witnessed any other vehicle pass Alvarez-Soto. Nor did he testify any other vehicle had been impeded by her pace.  Nor does the dash cam video—which recorded both the entirety of Alvarez-Soto's pertinent driving and the surrounding traffic—show that any other vehicle either passed her car or was impeded by her pace.

¶15       In the context of explaining his stop to Alvarez-Soto, Trooper Shewey also noted she had reduced her speed to seventy miles per hour. But, the state offered no testimony that traveling at seventy miles per hour—just five miles an hour below the posted maximum speed limit—was itself below "the normal speed of traffic" for the middle lane "under the conditions then existing":  circumstances that included a marked police car present among the nearby vehicles in traffic.  § 28-721(B).

¶16       Therefore, the issue before us is a narrow one.  We address whether drivers on Arizona's highways are compelled by § 28-721(B) to move from the middle lane to the right lane if they are passed by a lone vehicle on the right when the state has failed to elicit any testimony as to the speed of that vehicle.

¶17       We have previously reasoned that our legislature intended to provide some measure of flexibility in certain traffic statutes to account for the variable contingencies drivers may face while on our roadways.  For example, in *Livingston*, we concluded that the language of A.R.S. § 28-729(1), requiring drivers to remain "as nearly as practicable" within a single lane, reflects an "express legislative intent to avoid penalizing brief, momentary, and minor deviations outside the marked lines."  206 Ariz. 145, ¶ 10.  Similarly here, the language of § 28-721(B) recognizes that what constitutes "less than the normal speed of traffic" is contingent on "the time and place" as well as "the conditions then existing" on the roadway, rather

_____

[2]Trooper Shewey conceded that nearby drivers tend to slow down when they see a marked patrol car.  The video demonstrates that Alvarez-Soto did not lose pace with the vehicle on her right until the front of Shewey's patrol car nearly paralleled her back bumper.

than a determination based on rigid quantitative measures. No language therein expressly penalizes a driver for having been passed on the right by a single vehicle. Nor can our traffic laws be reasonably applied so that compliance with one section of the traffic code requires the violation of another. *See State v. Sorensen*, 255 Ariz. 316, ¶ 8 (App. 2023) (courts must construe statutes and subsections consistently and harmoniously).

¶18 Trooper Shewey's interpretation of § 28-721(B) violated both of these principles. By stopping Alvarez-Soto solely because she had been passed by one vehicle, he unreasonably required her to elevate one isolated cue that she may have been driving slower than "the normal speed of traffic" above the statutorily mandated assessment of all the surrounding traffic conditions. Furthermore, to avoid being passed by that vehicle, the record suggests Alvarez-Soto would have been required to exceed the maximum posted speed. *See* § 28-702.04(B), (C) (traffic violation to exceed maximum posted speed on interstate highways).

¶19 We decline to apply § 28-721(B) to affirmatively require drivers to violate our speeding laws in order to assure themselves they are proceeding at the "normal speed of traffic."[3] We likewise decline to read the flow-of-traffic provisions in § 28-721(B) as overriding our maximum speed laws, a construction that would grant travelers statutory permission to speed merely because other travelers are doing so. Rather, our traffic laws must be applied harmoniously and logically in the context of each other. *See Fleming v. State Dep't of Pub. Safety*, 237 Ariz. 414, ¶ 12 (2015) (courts must construe separate statutory provisions related to same subject matter together "as though they constitute one law"). We therefore conclude that "the normal speed of traffic" pursuant to § 28-721(B) necessarily refers to a speed not exceeding the maximum posted speed set forth in § 28-702.04. Under this construction, the failure to pace a speeding

---

[3] *See also United States v. Plasencia*, No. CR-14-01813-001-TUC-RM, 2015 WL 631277, at *3-4 (D. Ariz. Feb. 13, 2015) (suppressing evidence gathered after traffic stop pursuant to § 28-721(B) because, among other reasons, defendant traveled "close to or equal to the speed limit," sole vehicle to pass defendant traveled "only slightly faster than" defendant, and driver's obligation to move to right triggered only when proceeding below normal speed of traffic, which "certainly cannot require a driver to violate the speed limit in order to be in compliance"); Ariz. R. Sup. Ct. 111(c)(1)(C), (d) (extrajurisdictional decisions may be cited for persuasive value); Ariz. R. Crim. P. 31.19(e).

car can never be the sole basis for finding a failure to proceed at "the normal speed of traffic" in violation of § 28-721(B). The state has articulated no other basis for finding Alvarez-Soto in violation of § 28-721(B), the only ground Trooper Shewey articulated for the stop.

**¶20** The dissent correctly emphasizes that Trooper Shewey needed only a "minimal, objective justification" for an investigative stop. It then posits that Alvarez-Soto's failure to pace the car on her right alone constituted that justification. That reasoning overlooks that the state bore the burden of presenting objective facts showing that such a justification existed. Ariz. R. Crim. P. 16.2(b)(1) (state has burden of proving by preponderance of evidence lawfulness of acquisition of evidence at suppression hearing); *State v. Hyde*, 186 Ariz. 252, 266-68 (1996) (state has burden of persuasion at suppression hearing). And, it had the burden of doing so by the statutory criteria set forth for a violation of § 28-721(B). Although relevant, a driver's failure to match the speed of another vehicle to one's right is simply not the gravamen of that offense. Rather, the state bore the burden of demonstrating by a preponderance of evidence that the trooper had a sufficient objective basis for concluding that Alvarez-Soto's vehicle was proceeding below "the normal speed of traffic" under all of the then-existing conditions.[4] On the record before us, we merely conclude that the state presented insufficient objective facts to carry that burden.

**¶21** To the extent Trooper Shewey applied § 28-721(B) under circumstances in which no driver could comply without violating other traffic laws, he cast "too wide a net." *Sweeney*, 224 Ariz. 107, ¶ 22. Such applications of the law are not objectively reasonable because they "subject all travelers to 'virtually random seizures.'" *Id.* (quoting *Reid*, 448 U.S. at 441). For these reasons, the trial court erred in concluding that Shewey had reasonably stopped Alvarez-Soto and in failing to suppress the evidence collected during the resulting search.[5]

---

[4]The dissent also observes that Alvarez-Soto could have moved into the right-hand lane—an action that could have prevented a violation of this provision even under Trooper Shewey's motivated scrutiny. But the Fourth Amendment establishes a personal right to be free of unreasonable seizures by the government. Its enjoyment should not require travelers to thread behavioral needles to avoid the risk of unwanted intrusions.

[5]Alvarez-Soto also contends Trooper Shewey "unlawfully extended the traffic stop" because he requested her permission to search and run his dog around the vehicle after he had already issued the traffic violation

**Disposition**

¶22        Because we conclude the traffic stop was conducted without reasonable suspicion, we vacate Alvarez-Soto's convictions and sentences and remand this case to the trial court for further proceedings.

G A R D, Presiding Judge, dissenting:

¶23        The majority concludes that Trooper Shewey lacked reasonable suspicion to stop Alvarez-Soto's vehicle for violating A.R.S. § 28-721(B).  That statute requires a driver "proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing" to drive in the right-hand lane, or "as close as practicable" thereto, unless passing another vehicle or making a left turn.  *Id.*  The majority deems the officer's application of § 28-721(B) objectively unreasonable because, in its opinion, Alvarez-Soto could not have complied with that statute without violating other traffic laws, and it cautions officers to apply traffic laws in a flexible manner that accounts for the multiple variables drivers face on the roadways.  Because I believe the majority's decision is legally and factually erroneous, I respectfully dissent.

¶24        I begin by reviewing what reasonable suspicion is and is not because, in my view, the majority loses sight of these contours.  "If an officer has 'an articulable, reasonable suspicion, based on the totality of the circumstances,' that a traffic violation has occurred, he or she may conduct a limited investigatory stop."  *State v. Sweeney*, 224 Ariz. 107, ¶ 16 (App. 2010) (quoting *State v. Teagle*, 217 Ariz. 17, ¶ 20 (App. 2007)).  "Although 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory detention."  *Teagle*, 217 Ariz. 17, ¶ 25 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  And "[i]n reviewing the totality of the circumstances, we accord deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious actions."  *Id.* ¶ 26; *see State v. Evans*, 235 Ariz. 314, ¶ 8 (App. 2014) ("A reviewing court must consider whether the historical facts, along with the inferences drawn by law enforcement officers and the trial court, satisfy the constitutional standard.").  We also must defer to the trial court's factual findings, both express and implied.  *See State v. Zamora*, 220 Ariz. 63, ¶ 7 (App. 2009) (in reviewing denial of motion to suppress, "[w]e will infer the

_____

warning and returned her license and registration.  Because we grant relief on the issue of the traffic stop's reasonableness, we need not reach this issue.

necessary findings to affirm the superior court," so long as "the implied findings do not conflict with the court's express findings").

¶25　　Reasonable suspicion is a relatively low bar. *See State v. Serna*, 235 Ariz. 270, ¶ 27 (2014) (describing reasonable suspicion as "a low standard, readily established in many search settings"). In fact, the standard for reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. In other words, "[b]y definition, reasonable suspicion is something short of probable cause." *Teagle*, 217 Ariz. 17, ¶ 25 (quoting *State v. O'Meara*, 198 Ariz. 294, ¶ 10 (2000)). "It does not . . . 'require solid proof, but rather an objective basis to believe that criminal activity [or a traffic violation] might be occurring sufficient to justify further investigation.'" *Devlin v. Browning*, 249 Ariz. 143, ¶ 10 (App. 2020) (quoting *State v. Turner*, 243 Ariz. 608, ¶ 7 (App. 2018)); *see also State v. Nevarez*, 235 Ariz. 129, ¶ 7 (App. 2014) (officer need not "determine if an actual violation has occurred prior to stopping a vehicle for further investigation").

¶26　　Applying these standards here, I would conclude that, in the totality of the circumstances, Trooper Shewey had reasonable suspicion to stop Alvarez-Soto's vehicle. *See Sokolow*, 490 U.S. at 7; *Teagle*, 217 Ariz. 17, ¶ 25. At the suppression hearing, Shewey testified based on his training and experience that, on a three-lane highway, the left-hand lane is considered the fast lane, the middle lane is considered the travel lane, and the right-hand lane is considered the slow lane. In general, on the interstate, law-enforcement officers "try to keep traffic moving at the request[ed] highway speed" of seventy-five miles-per-hour. Signs are posted every five or six miles directing slower traffic to stay to the right. But Shewey often sees drivers on the interstate use the right-hand lane to pass slower drivers in the middle lane. In those instances, officers enforce § 28-721(B) because collisions, sideswipes, and road rage occur when drivers pass on the right.

¶27　　Trooper Shewey initially noticed Alvarez-Soto's car after his license-plate reader flagged it as a vehicle newly registered in Nogales, Arizona, which had already crossed the border into Mexico multiple times. Because these factors suggested the vehicle was associated with drug trafficking, Shewey elected to follow it and conduct a traffic stop if the driver gave him grounds. At points, the vehicle exceeded the maximum posted speed of seventy-five miles per hour, which alone could have justified a traffic stop. Eventually, while driving in the middle lane, the vehicle reduced its speed to approximately seventy miles-per-hour. When it did so, a car driving in the right-hand lane passed it. Shewey testified

that the fluctuation in speed of Alvarez-Soto's car, combined with another vehicle passing it on the right, led him to conclude he had reasonable suspicion for a traffic stop.

¶28 The two recordings from Trooper Shewey's dashboard camera, taken from different angles, corroborate his testimony.[6] They depict Alvarez-Soto's vehicle, while traveling in the middle lane, reduce its speed and be overtaken by a car driving in the right-hand lane. Alvarez-Soto continues driving in the middle lane; she does not activate her turn signal or otherwise make an effort to move right until Shewey initiates the traffic stop. As I view the recording, twenty-six seconds elapse between the time the vehicle in the right-hand lane fully clears Alvarez-Soto's car and the time Shewey activates his emergency lights.

¶29 Viewed in the totality of the circumstances, Shewey's testimony, combined with the recordings, contains the minimal, objective facts necessary to support a conclusion that Alvarez-Soto violated at least one traffic law. *See Sokolow*, 490 U.S. at 7; *Teagle*, 217 Ariz. 17, ¶ 25. As set forth above, the officer's testimony established that drivers are generally expected to travel the speed limit on the interstate; that Alvarez-Soto reduced her speed below the speed limit while in the middle lane such that traffic in the right-hand lane outpaced her; and that Alvarez-Soto then failed to move right despite being able to do so safely. And from these facts, the trial court could reasonably have concluded that Trooper Shewey had reasonable suspicion to believe that Alvarez-Soto was driving slower than the normal speed of traffic, and was doing so in the middle lane. *See* § 28-721(B). We owe deference to both the trooper and the court in this context and, applying that deference, I would affirm the court's ruling. *See Teagle*, 217 Ariz. 17, ¶ 26; *Zamora*, 220 Ariz. 63, ¶ 7.

¶30 The majority, however, insists that Trooper Shewey should not have viewed § 28-721(B) as a rigid directive but as a flexible guideline,

---

[6]The majority views these recordings independently and makes its own factual findings. Although I agree the recordings speak for themselves, we must nonetheless view them in the context of Trooper Shewey's testimony. In addition, the majority and I differ in interpreting Alvarez-Soto's driving behavior and the options available to her, as captured on the recordings. That the recordings are subject to multiple reasonable interpretations underscores the importance of deferring to Shewey's in-the-moment assessment of Alvarez-Soto's driving. *See Teagle*, 217 Ariz. 17, ¶ 26; *Evans*, 235 Ariz. 314, ¶ 8.

to be interpreted in view of the many other vehicular laws a driver must navigate on the interstate. In the majority's opinion, Alvarez-Soto could not have complied with § 28-721(B) without exceeding the speed limit. But as a factual matter, it seems to me that Alvarez-Soto had multiple ways to adjust her driving in the minutes leading up to the stop to ensure compliance with all laws including, at a minimum, by immediately falling in behind the vehicle in the right-hand lane when it became obvious that its speed exceeded hers. I do not agree with the majority that Alvarez-Soto would have had to speed to comply with § 28-721(B).

**¶31** Moreover, it is the law's expectation that drivers will comply with the multiple traffic laws governing them at any one time; when a driver violates one of those laws, she may be cited. *See* A.R.S. § 13-3883(B) ("A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of any traffic law committed in the officer's presence and may serve a copy of the traffic complaint for any alleged civil or criminal traffic violation."); *cf. Whren v. United States*, 517 U.S. 806, 818-19 (1996) (rejecting, in considering probable cause, argument that search was improper because "the 'multitude of applicable traffic and equipment regulations' is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop"). A driver must necessarily think multiple steps ahead, making proactive decisions to ensure both safety and compliance with traffic laws. I am not persuaded by the majority's suggestion that officers must avoid conducting traffic stops when a driver fails to effectively navigate all appliable laws and thereby places herself in the type of Catch-22 situation the majority perceives here.

**¶32** The majority relies on *State v. Livingston*, 206 Ariz. 145, ¶ 10 (App. 2003), in which we concluded in the context of A.R.S. § 28-729(1) — which requires drivers to drive "as nearly as practicable" in a single lane — that drivers should not be penalized for brief and minor deviations from the lanes of travel. The driver in *Livingston* had briefly crossed the road's right lane line with her passenger-side tires, but had otherwise driven appropriately, and there was no surrounding traffic. *Id.* ¶¶ 4-5. In comparison, I do not perceive Alvarez-Soto's driving as a brief or momentary deviation from the statutory requirements; rather, as I have explained, I believe the testimony and the recording supports the conclusion that, after Alvarez-Soto slowed to below the normal speed of traffic as measured by the speed limit and the vehicle to her right, she had ample time to correct course or change lanes. I thus view her conduct as

more akin to a continued violation of § 28-721(B), rather than a brief and momentary one.  Moreover, unlike the driver in *Livingston*, Alvarez-Soto also committed a speeding infraction during the time Trooper Shewey observed her.

**¶33**         The majority further suggests that Trooper Shewey stopped Alvarez-Soto based on "rigid quantitative measures" not supported by § 28-721(B)'s text.  It observes that the statute does not expressly penalize a driver for being passed on the right "by a single vehicle."  To be sure, the statute does not prohibit being passed on the right, by one vehicle or multiple ones.  *See* § 28-721(B).  But it requires slower traffic to stay to the right, and the fact that a middle-lane driver is driving at a slower speed than a right-lane driver is a data point appropriately considered in the totality-of-the-circumstances analysis.  And we must defer to the officer's training and experience in determining the normal speed of traffic for the stretch of interstate at issue, at the time and place of the traffic stop. *See Evans*, 235 Ariz. 314, ¶ 8; *Teagle*, 217 Ariz. 17, ¶ 26.  The majority cites no authority for its conclusion that an officer may not make that determination by comparing a suspect's vehicle to one other, particularly when traffic is relatively light.  As I have explained, the totality of the circumstances here—including Alvarez-Soto's reduction in speed while in the center lane and her failure to move to the right-hand lane after being overtaken by a car traveling there—establishes reasonable suspicion that Alvarez-Soto violated § 28-721(B).

**¶34**         Departing from its emphasis on the statutory language, the majority further observes that Trooper Shewey did not testify that Alvarez-Soto's vehicle had impeded any other.   The majority also speculates that Alvarez-Soto—who did not testify at the suppression hearing—may have reduced her speed because she observed Officer Shewey's patrol car behind her.  But a driver need not obstruct other traffic in order to violate § 28-721(B)—the statute merely requires that a driver traveling below the normal speed of traffic in light of the time, place, and circumstances do so in the right-hand lane.  Further, even if Alvarez-Soto reduced her speed in reaction to the officer's presence, that does not mean she did not commit a traffic violation.  And we may not, in deciding whether reasonable suspicion exists, "parse out each individual factor, categorize it as potentially innocent, and reject it"; we must instead "look at all of the factors, (all of which would have a potentially innocent explanation, or else there would be probable cause), and examine them collectively."  *Teagle*, 217 Ariz. 17, ¶ 25 (quoting *O'Meara*, 198 Ariz. 294, ¶ 10); *see Devlin*, 249 Ariz. 143, ¶ 16 (rejecting argument that reasonable

suspicion did not exist "because certain indications of intoxication were not present," and noting that "no Arizona statute or case has narrowed reasonable suspicion to such an impracticable standard" (emphasis omitted)).

¶**35**     For these reasons, I would conclude that Trooper Shewey had reasonable suspicion to stop Alvarez-Soto's vehicle for a traffic violation. I therefore respectfully dissent from the majority's decision.